**367 A.2d 1073.**

STATE *vs.* JAN PAUL ECKHART.

JANUARY 13, 1977.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher and Doris, JJ.

KELLEHER, J. This is a two-count indictment, which charges the defendant with the illegal possession and the delivery of marijuana, both of which are violations of the Uniform Narcotic Drug Act, G. L. 1956 (1968 Reenactment) §§21-28-31 and 21-28-32. A Superior Court jury returned a not guilty verdict on the possession count and a guilty verdict on the delivery count.

The prosecution's case depended on the testimony of Annette, an informer in the pay of the state's Division of Drug Control. Annette told the jury that she met Eckhart at a prearranged get-together in a Newport nightclub on the evening of February 9, 1974, for the express purpose of purchasing from him some amphetamines. According to Annette, when the meeting took place, Eckhart told her that he was unable to obtain the amphetamines, but he then took a "Baggie" out of his coat pocket and

gave her two marijuana cigarettes.[1] When Annette inquired as to the purchase price, Eckhart told her that there was to be no charge. Annette took the cigarettes, left the premises, and delivered the contraband to an awaiting state narcotics agent. Annette had been carrying an electronic bugging device that transmitted her nightclub conversation to the agent, who was equipped with a receiver. She conceded that the continuance of her status as a paid informer depended on her ability to supply information. In likening her work to that of an employee of a jewelry manufacturer, she remarked: "* * * they ain't going to pay you to make jewelry if you're not going to make any, you know."

At the time of the trial, Eckhart was a 28-year-old middle-school teacher. He admitted that he did encounter Annette at the nightclub but under circumstances which, according to him, differed from those described by the state's informer. According to Eckhart, he was seated in the nightclub with his friend, Mike, when Annette approached the table and asked him if he had any drugs. When the teacher responded in the negative, Mike asked Eckhart about the identity of their visitor. Eckhart told Mike that he had met Annette while he worked after school at his parents' Newport restaurant. At the trial Eckhart insisted that whenever Annette came into the restaurant, she would ask him if he had any drugs, and he, in turn, would tell her that he never trafficked in such commodities.

Once Eckhart had explained to Mike how Annette fitted into the spectrum of Newport's cafe society, Mike supposedly took a "Baggie" out of his pocket, placed it under the table, and told Eckhart to pass it along to Annette. Eckhart passed the plastic packet which he assumed con-

---

[1] When Annette testified, the jury heard the jargon of the street. She called the amphetamines "speed," the marijuana "dynamite smoke," and the cigarettes "joints."

tained marijuana to Annette, who, in turn, left the table and retired to the Ladies' Room. Upon her return, she slipped the packet under the table to Eckhart, and the "Baggie" made its return trip to Mike. Eckhart insisted that the two cigarettes that are in evidence were Mike's, not his.

By the time the trial was held, Mike was a member of the United States Army. His testimony was presented by way of a deposition. Mike identified himself and his present occupation. He admitted that he was present in the nightclub with Eckhart when Annette joined them. From that point on, he exercised his fifth amendment rights and refused to answer any inquiries as to what actually transpired at the table.

During the cross-examination of Annette, the defense embarked upon an impeachment strategy, which was premised on the theory that it was going to show the jury that in September 1973 Annette had been charged by the Newport police with being a prostitute; that in January 1974 the Newport Police Department reduced the prostitution charge to one of disorderly conduct; and that this reduction was all part of a departmental agreement to overlook Annette's purported professional pursuits so long as she kept informing and testifying as she did at Eckhart's March 1975 trial. The trial justice faulted the defense's theory and refused to let the jury hear about the prostitution charge. The defendant contends that the trial justice's ruling was an error of constitutional dimension. The state disagrees, and so do we.

The sixth amendment to the United States Constitution guarantees an accused the right of confrontation in all criminal matters and the right to an effective cross-examination is part of one's sixth amendment right. *Davis* v. *Alaska,* 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed. 2d 347, 353 (1974); *Douglas* v. *Alabama,* 380 U.S. 415,

418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965). This right is secured through the fourteenth amendment in state criminal proceedings. *Smith* v. *Illinois,* 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); *Pointer* v. *Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Article I, §10, of the Rhode Island Constitution also guarantees this right. *State* v. *Myers,* 115 R.I. 583, 350 A.2d 611 (1976).

The basic purpose of cross-examination is to impeach the credibility of a witness by discrediting the testimony adduced on direct examination. *Atlantic Refining Co.* v. *Director of Pub. Works,* 102 R.I. 696, 713, 233 A.2d 423, 432 (1967). One traditional method of impeachment is to show that a witness has bias or prejudice toward one of the parties or has a personal interest in the outcome of the case which can be expected to color his testimony and undermine its reliability.

Within recent times the United States Supreme Court has reminded us that a trial court must be particularly solicitous of the cross-examiner who intends to disclose such bias or prejudice or interest. *Davis* v. *Alaska, supra.* An ample opportunity should be afforded the examiner whose goal is to establish the fact that the adverse witness in a criminal proceeding is giving his or her testimony in the expectation of favorable treatment by the state. *Alford* v. *United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). Even though the Supreme Court has endorsed the principle that a cross-examiner, in seeking to show bias or interest in a particular case, should be given a greater latitude than that afforded in those instances when the examiner is engaged in a general broadside attack on the credibility of a witness, the Court has made it clear that the right to cross-examination in this area of bias or interest is not open-ended. Although reasonable latitude certainly must be accorded during cross-examination, the

scope of the examination as to any proper subject of inquiry remains subject to the control of the trial court's sound discretion. *Davis* v. *Alaska, supra; Smith* v. *Illinois, supra* at 132, 88 S.Ct. at 750, 19 L.Ed.2d at 959. The trial court still retains its right to preclude an inquiry that is irrelevant or has no probative force. The right to cross-examination does not include the right to ask repetitive questions or harass, annoy, or humiliate a witness on cross-examination. *Alford* v. *United States, supra; State* v. *Capone,* 115 R.I. 426, 347 A.2d 615 (1975). Inquiry may not be made into matters which might imperil the life or well-being of the witness or his family. *State* v. *Ciulla,* 115 R.I. 558, 569, 351 A.2d 580, 587 (1976).

In seeking to determine whether Eckhart was given the opportunity to present to the jury sufficient facts to support his contention concerning the Newport Police Department's secret support of Annette's alleged solicitation of the opposite sex, the record indicates that when the defense first asked Annette if the police department did "any favors" for her in return for her acting as an informant for the state, the prosecutor lodged an objection, and the jury was escorted from the courtroom.

The defense then assured the trial justice that it intended to show that during the time Annette was in the employ of the state, "* * * she was also operating in Newport as a prostitute and that her operation as a prostitute in Newport was covered up by the Newport Police Department and that's the favor that they did in return for her operating for the Division of Drug Control." When the trial justice inquired, "[a]re you prepared to establish that?" he received the following qualified response: "To a degree I am." The defense then went on to explain that it had in its possession a certified copy of the amended complaint which showed the prostitution charge being reduced to disorderly conduct, and that in its opinion the

jury could look at the document and decide for itself what brought about the reduction.

The trial justice thought otherwise. In the colloquy that ensued, the trial justice made it clear that the mere fact that the complaint was amended was irrelevant because "* * * [D]istrict [C]ourt complaints and warrants are amended with such frequency, so often, for so many reasons, that you just aren't on solid enough ground. I think it would be very prejudicial and you would also be, in effect, smearing a witness where you couldn't show a conviction for prostitution." Subsequently, the trial justice ruled that if he was satisfied that there was some link, "however tenuous," between the reduction of the charge and the securing of Annette's courtroom testimony, he would have permitted the jury to hear the evidence relating to the reduced charge. However, the trial justice, in barring the introduction of the prostitute's complaint, also alluded to the fact that the complaint had been amended over a year before the case came on for trial and the obvious fact that the jury was well aware that Annette, since she was being paid piece-work wages by the Division of Drug Control, had an obvious interest in the outcome of the case.

We cannot fault the trial justice. While this court has said that fishing on cross-examination is permitted, the trial justice may ask the fisherperson to demonstrate that there is a reasonable possibility there are fish in the pond before the license is issued. Here the trial justice, after an extensive consideration of the issue, was satisfied that the defense was unable to supply any nexus between the 1974 reduction and Annette's 1975 appearance for the prosecution. While the defense has a right to attempt to discredit Annette's testimony, it did not, in the light of the evidence adduced at trial, have a constitutional right to use the

prostitution charge as a means of impugning her moral character.

Before leaving this facet of the appeal, we would point out, as did the trial justice, that the jury was well aware that Annette did not come to court in the role of a public-spirited citizen who testifies as to what occurred at some sudden and unexpected episode. The jury knew that Annette was on the state payroll and that her pay depended on her ability to produce information that would lead to arrest.

Verdict inconsistency is an issue that has engendered a torrent of litigation within our nation's judicial system. *See* Annot., 18 A.L.R.3d 259 et seq. (1968). The landmark case in this area of the law is *Dunn* v. *United States,* 284 U.S. 390, 393-94, 52 S.Ct. 189, 190-91, 76 L.Ed. 356, 358-59 (1932), where Chief Justice Holmes remarked: "Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. * * * That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." Quoting *Steckler* v. *United States,* 7 F.2d 59, 60 (2d Cir. 1925), Mr. Justice Holmes stated: " 'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."

The holding in *Dunn* stands for the proposition that the jury should be afforded broad powers to arrive at inconsistent verdicts of acquittal and conviction through its traditional power to compromise whether it is motivated by leniency or other considerations. The *Dunn* rule still

represents the weight of authority. Courts will continue to uphold jury verdicts that may be logically inconsistent so long as the verdicts are legally consistent. *People* v. *Joyner,* 50 Ill.2d 302, 278 N.E.2d 756 (1972). The jury's prerogative will go by the boards if verdicts are rendered upon charges in which the elements of the offense alleged are identical. *State* v. *Mercado,* 263 S.C. 304, 210 S.E.2d 459 (1974). In the past we have recognized that the same action or transaction can give rise to different crimes. *State* v. *Boudreau,* 113 R.I. 497, 322 A.2d 626 (1974); *State ex rel. Scott* v. *Berberian,* 109 R.I. 309, 284 A.2d 590 (1971).

The issue here, as it was in *Boudreau,* was whether proof of one offense is also proof of the other, and in seeking to find the answer we will first look to the trial justice's charge. Neither defense nor prosecutor lodged any objection to its contents. The trial justice told the jury that Eckhart was charged with two separate offenses. In defining "possession," he emphasized the element of control and told the jury that "possession" meant "* * * having a thing in one's power or in one's custody; having it in your hand or in your pocket or in a glove compartment of a car." In charging on the delivery count, he made no reference to the element of control but told the jury that if the state was to prevail, it had to show a gift, transfer, or handover of the marijuana by Eckhart.

With the charge in mind, and looking to the evidence presented at the trial, there is, we believe, a very simple and logical explanation for the jury's verdict. It is reasonable to assume that the jury did not believe the testimony of Annette but rather accepted the defendant's own testimony, which showed that he acted as a transfer agent for the package, which he "assumed" contained marijuana. The jury believed him and disbelieved Annette's story that Eckhart had taken the "Baggie" out of his coat pocket and from there given her the cigarettes. The verdict as returned

440

by the jury finds support in the evidence and the law as given by the trial justice. We find no inconsistency.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is sustained, and the case is remanded to the Superior Court.

Mr. Justice Paolino did not participate.

*Julius C. Michaelson,* Attorney General, *Gregory L. Benik,* Special Asst. Attorney General, for plaintiff.

*Corcoran, Peckham & Hayes, Kathleen Managhan, Joseph T. Houlihan,* for defendant.