STATE

v.

James F. CANNING.

No. 85–407 C.A.

Supreme Court of Rhode Island.

May 17, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Annie Goldberg, Asst. Attys. Gen., for plaintiff.

John A. MacFayden, 3rd, John F. Sheehan, Providence, for defendant.

## OPINION

FAY, Chief Justice.

The former executive director of the Rhode Island Turnpike and Bridge Authority (the authority), James F. Canning, appeals to this court from a Superior Court jury conviction for thirty-one counts of filing false documents with the authority, in violation of G.L. 1956 (1981 Reenactment) § 11–18–1.[1] The jury also found the defendant guilty on one count of obtaining money by false pretenses, in an amount exceeding $500, pursuant to G.L. 1956 (1981 Reenactment) § 11–41–4.[2] The offenses related to vouchers totaling approximately $2,500 that defendant submitted to the authority for reimbursement from its travel and expense account.

On April 17, 1985, defendant filed an appeal premised on several issues. In his arguments, defendant questioned the constitutional impact of the trial justice's having granted an inadequate continuance, the scope of cross-examination permitted at trial, and the denial of his motions for acquittal and to pass the case.[3] He also pressed his objection to the trial justice's having allowed the jurors to take notes without giving a cautionary instruction and to his having ordered the jurors' notebooks destroyed after their deliberations. The defendant presented his arguments to this court on May 6, 1987. At that time we determined that the limitation of defense counsel's ability to cross-examine prosecution witnesses formed the crux of defendant's appeal. He argued that through cross-examination he could show that the

1. General Laws 1956 (1981 Reenactment) § 11–18–1 reads:

   "No person shall knowingly give to any agent, employee, or servant in public or private employ, or public official any receipt, account, or other document in respect of which the principal, master, or employer, or state, city, or town of which he is an official is interested, which contains any statement which is false or erroneous, or defective in any important particular, and which, to his knowledge, is intended to mislead the principal, master, employer, or state, city, or town of which he is an official. Any person who violates any of the provisions of this section shall be deemed guilty of a misdemeanor, and shall, on conviction thereof, be imprisoned, with or without hard labor, for a term not exceeding one (1) year, or be fined not exceeding one thousand dollars ($1,000)."

2. General Laws 1956 (1981 Reenactment) § 11–41–4 provides in pertinent part:

   "Every person who shall obtain from another designedly, by any false pretense or pretenses, any money, goods, wares, or other property, with intent to cheat or defraud * * * shall be deemed guilty of larceny."

   Section 11–41–5 defines the penalties for violation of this statute.

3. The case was originally docketed for October 3, 1984. The trial justice granted defendant's motion for a continuance on the preceding day to give the state an opportunity to evaluate defendant's medical condition. The defense contended that Canning's condition inhibited his ability to participate in his defense and that an immediate trial would disrupt his recovery from severe depression and alcoholism. Although the trial justice continued the matter until October 31, 1984, the record indicates that no competency hearing was held until November 13, 1984. On that date the trial justice determined that any potential improvement in defendant's memory, concentration ability, or emotional well-being would not be substantial enough to warrant further delay. He therefore set trial for January 7, 1985.

authority knew of Canning's legitimate reimbursement procedure for permissible expenses. In order to determine whether the limited cross-examination detrimentally affected defendant's suit, we remanded the case to the trial court for an evidentiary hearing to elicit the substance of the curtailed testimony. The order further directed the trial justice to make findings concerning whether the cross-examination would have affected the outcome of the case.

General Laws 1956 (1979 Reenactment) chapter 12 of title 24 describes the authority's management structure. The authority is a statutory agency created to construct or acquire the turnpike and bridges, as defined in § 24-12-1, and to control their maintenance and operation. Section 24-12-5. Five members, who receive $40 for each day spent conducting authority business, compose the authority. Section 24-12-4 states that in addition "authority members * * * shall be paid their necessary expenses while engaged in the performance of their duties * * *." The authority has the power to appoint an executive director. Although the executive director receives a salary, a reimbursement mechanism similar to the statutory provision entitles him or her to repayment for business expenses.

Evidence adduced at the initial trial defines the authority's finances. As executive director of the organization for seventeen years, Canning was essentially responsible for its daily operation. It was his duty to formulate a budget in conjunction with the authority's chief of accounting, Marion J. Pierce. They would submit the budget proposal to the authority members for review and then to the bondholders and bondholders' trustees (the banks) for final approval. In the authority's fiscal year July 1, 1981, through June 30, 1982, its total operating expenses were $1,430,000. The budget contains a travel and advertising expense line, account No. 516, which approximated 12 percent of the budget. All management personnel could obtain reimbursement for legitimate business expenses from account No. 516. Canning's and Pierce's signatures of approval on any submitted voucher as a valid operating expense were required before an authority check would issue, although any major item also required approval of the authority members. Canning thus had the power to approve the vouchers for his expenses and to sign a check to himself with Pierce's countersignature.

The defendant usually submitted a travel expense report each week. His secretary, Christine Jacquette, would prepare the form by filling in Canning's name and the dates. She would then give the form with her employer's appointment book to him, and he would fill in his meetings, mileage, meal expenses, and miscellaneous expenditures. He would return the form to Jacquette, who would compute the mileage at fifteen cents a mile, total the figures for the week, and write a check for the appropriate amount. Canning would proceed to sign and endorse the check and approve payment on the travel form itself. Jacquette would subsequently cash the check at the toll booth and bring the money to Canning.

Evidence at the initial trial revealed problems in the apparent integrity of this reimbursement process. Pierce testified that she had a conversation with Canning in which he expressed some concern about the lack of substantiating receipts for his expense reports and the impending annual audit. Subsequent to that conversation, Pierce purchased some blank guest checks at an office supply store and left them on Jacquette's desk. Jacquette stated that when she ultimately filed a travel expense report the check and restaurant receipts were attached to it. Jacquette added that she had attached to the expense sheets "a few" of the guest checks, identified as receipts from Christie's, from the pad Pierce had left on her desk. The testimony thus indicated that the receipts did not originate at the restaurant.

Additional evidence undermined the veracity of the documentation. Canning asked Pierce for the file of vouchers early in 1982. He returned the folder about two days later, on April 15, 1982. Although Pierce did not notice anything different about the folder at that time, Jacquette

testified that when she walked into Canning's office that afternoon she saw Edward Dugan, former vice chairman of the authority, examining the travel-expense reports. She observed that the slips she normally appended had changed from the uniform buff-colored slips from Christie's to papers of varying shapes and sizes. From this evidence, the jury could properly infer that someone had tampered with the documentation.

To disprove the expenses Canning claimed to have incurred, the prosecution presented the travel-expense vouchers in conjunction with the diary entries. Entries detailing meetings attended, miles traveled, meals consumed, and miscellaneous expenditures were read into evidence. Canning sought reimbursement for meals that cost an average of $7 to $8, 90 to 100 miles driven to Providence for meetings, and $3 to $4 for miscellaneous items. The prosecution then presented more than a dozen witnesses who testified that they had not attended the meetings listed in the vouchers. For example, state exhibit No. 16, the expense report dated October 8, 1981, through October 14, 1981, contained an entry for a meeting with the trustees of Rhode Island Hospital Trust and Industrial National Bank (currently Fleet National Bank).[4] A similar entry appeared on state's exhibit No. 36, the expense report for February 25, 1982, through March 3, 1982. A vice president in charge of several corporate departments at Fleet, the head of the special corporate services department, as well as the assistant manager supervising corporate trust activity all testified that they did not meet with Canning on the dates in question, October 13, 1981 and February 26, 1982. The person in charge of the corporate trust department at Rhode Island Hospital Trust also denied having met Canning on the dates scheduled in the appointment book.

The prosecution provided further evidence that other scheduled meetings never took place. Canning alleged at least twenty-three meetings with an attorney who represented the authority in labor-relations matters. The attorney's schedules, however, coincided with Canning's documentation on only three occasions. When questioned about some of the purported meetings, the attorney responded that he had been away on vacation at that time. Another attorney who represented the authority in a litigation matter testified that he knew Canning personally and that he had met numerous times with Canning to discuss authority business. Nevertheless he denied that any contact occurred on twenty listed occasions. Communications listed as meetings for which Canning claimed both mileage and meals were actually telephone conversations.

To refute the mileage claims, the prosecution presented an engineering technician from the Rhode Island Department of Transportation. He measured four routes from the Jamestown location of the authority to downtown Providence. Using a calibrated friction testing unit to ensure accurate results, the engineer reported the distance measurements to a civil engineer who calculated the final mileage to be 30.59, 40.47, 34.65, and 33.60 miles. These figures directly contravene Canning's average mileage claim. Lastly, to disprove the veracity of the restaurant receipts, the prosecution called managers of the three commonly listed eating establishments to testify at trial. The managers could recognize neither the supposed receipts nor Canning as a regular customer.

The defendant argues that the authority did not depend on the vouchers for their accuracy. Instead, defendant sought reimbursement for legitimate, but surreptitious, authority business. The authority, for example, hired a private investigator to discover whether the employees at the Mount Hope bridge in Bristol, Rhode Island, were mishandling the toll collections. The defense contended that Canning personally paid the investigator to prevent the employees from discovering the investigation. Other moneys were allegedly expended to sponsor a retirement party, a union party, a Christmas party, and political contributions on behalf of the authority. The trial

4. According to testimony, expense reports were dated from Friday through Wednesday.

justice sustained the prosecution's objections to this line of cross-examination of authority management personnel. He reasoned that the questions were neither addressed in direct examination nor designed to impeach the witnesses' credibility or recollection.

The inability to bring forth this information provides the basis of this appeal. The defendant claims that the limitation of his ability to cross-examine his adverse witnesses violated his rights under Rhode Island Constitution art. 1, sec. 10, and the Sixth and Fourteenth Amendments of the United States Constitution.[5]

■■■ Upon examining the testimony given pursuant to the remand of this case, we affirm the trial justice's finding. We hold that the limitation did not infringe upon defendant's constitutional rights. Furthermore, any infringement in the instant case would have constituted error harmless beyond a reasonable doubt. The United States Supreme Court has repeatedly stated that not all trial errors that violate the Constitution warrant reversal of the judgment. *See, e.g., Rose v. Clark*, 478 U.S. 570, ——, 106 S. Ct. 3101, 3105, 92 L. Ed. 2d 460, 469 (1986); *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The purpose of constitutional protections in criminal proceedings is to ensure that the trials lead to fair and correct judgments in an economical and expedient manner. *See Rose v. Clark*, 478 U.S. at ——, 106 S. Ct. at 3107, 92 L. Ed. 2d at 471. The denial of an opportunity to cross-examine an adverse witness constitutes such an error; it does not fall into the category of constitutional errors that are automatically deemed prejudicial. *Delaware v. Van Arsdall*, 475 U.S. 673, 682, 106 S. Ct. 1431, 1437, 89 L. Ed. 2d 674, 685 (1986); *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969). Therefore, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole

record, that the constitutional error was harmless beyond a reasonable doubt." *Rose v. Clark*, 478 U.S. at ——, 106 S. Ct. at 3105, 92 L. Ed. 2d at 469 (quoting *Delaware v. Van Arsdall*, 475 U.S. at 681, 106 S. Ct. at 1436, 89 L. Ed. 2d at 684). In *Van Arsdall* the Supreme Court listed the appropriate factors in determining what constitutes harmless error.

"These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438, 89 L. Ed. 2d at 686–87.

The Sixth Amendment, as applied to a state proceeding through the Fourteenth Amendment of the United States Constitution, and article 1 of the Rhode Island Constitution guarantee an accused the right to effective cross-examination in all criminal matters. *See State v. Burke*, 522 A.2d 725, 733 (R.I. 1987); *State v. Eckhart*, 117 R.I. 431, 434–35, 367 A.2d 1073, 1075 (1977). Rhode Island precedent, however, has abrogated the per-se error rule as it applies to limited cross-examination in accordance with the *Van Arsdall* decision. *State v. Manocchio*, 523 A.2d 872 (R.I. 1987). Once sufficient examination has been given to satisfy the right of confrontation, the trial justice has the discretion to determine the proper subjects and scope of inquiry. *State v. Vento*, 533 A.2d 1161, 1164 (R.I. 1987); *State v. Payano*, 528 A.2d 721, 729 (R.I. 1987); *see also State v. Cianci*, 430 A.2d 756, 761 (R.I. 1981). Thus our appellate review is limited to disturbing the trial justice's ruling only in those cases wherein he or she has clearly abused his or her reasonable discretion. *State v. Cianci*, 430 A.2d at 761; *State v. Benevides*, 420

---

5. The Constitution of the State of Rhode Island art. 1, sec. 10, addresses the rights of accused persons in criminal proceedings. It states in pertinent part, "In all criminal prosecutions, accused persons shall enjoy the right * * * to be

confronted with the witnesses against them, to have compulsory process for obtaining them in their favor, to have the assistance of counsel in their defense, and shall be at liberty to speak for themselves * * *."

**462**

A.2d 65, 69 (R.I. 1980); *State v. Eckhart,* 117 R.I. at 435–36, 367 A.2d at 1075–76.

In compliance with our order of remand, the trial justice heard cross-examination testimony on the previously excluded subjects. Contrary to defense counsel's offers of proof during the initial trial, the testimony did not support the defense. The chairman of the authority at the time, John J. Gill, testified that the authority had paid the hired private investigator a retainer fee of $500, that it was not listed as Canning's expense, and that he had no knowledge that Canning personally expended money to pay the investigator. He stated that the authority did not give Canning permission either to sponsor Christmas parties for the employees or to purchase gifts for them. When parties were held, he paid $25 to attend. He further testified that the authority never instructed Canning to entertain legislators. At the original trial he stated, "I don't think a man of that stature needed to have me worrying about his expense account."

Marion J. Pierce's testimony substantiated Gill's responses. She testified that the employees would organize retirement parties, which they financed in Dutch-treat fashion. She was not aware that Canning had paid for the investigator from personal funds. On the contrary, although she recorded one $175 check to Canning in February 1981, she accounted for authority payment of each bill submitted in 1981 and 1982 for the investigations.

We agree with the trial justice's assessment of this evidence. Rather than support defendant's argument that the authority sought to reimburse defendant surreptitiously, the testimony actually favored the prosecution. Direct compensation by the authority presents the more reasonable inference. Any limitation of defendant's ability to cross-examine adversary witnesses at trial therefore constituted harmless error.

The cumulative testimony makes this evidence satisfy the *Van Arsdall* definition of harmless error. The witnesses corroborated one another, and their testimony only substantiated the falsity of the expense reports. We easily distinguish the instant case from *State v. Plunkett,* 497 A.2d 725 (R.I. 1985), an embezzlement case. In *Plunkett* the defendant's conviction depended on circumstantial evidence that the defendant could directly contradict on cross-examination concerning sloppy accounting practices.

For these reasons the judgment of conviction is affirmed. The defendant's appeal is denied and dismissed, and the papers of this case are remanded to the Superior Court with our decision endorsed thereon.

MURRAY, J., did not participate.