Robert J. PAZIENZA

v.

Mary Ann PAZIENZA.

No. 90–84–Appeal.

Supreme Court of Rhode Island.

July 18, 1991.

Milan Azar, Warwick, for plaintiff.

Alfred Factor, Jason D. Monzack, Kirshenbaum & Kirshenbaum, Cranston, for defendant.

Anthony J. Gianfrancesco, Providence, for third-party defendant.

## OPINION

KELLEHER, Justice.

This saga began in September 1984 when the plaintiff, Robert J. Pazienza (Robert), filed a complaint for divorce in Kent County. In this complaint Robert alleged that irreconcilable differences had arisen between himself and the defendant, Mary Ann Pazienza (Mary Ann). Both Robert and Mary Ann entered into a property-settlement agreement (agreement) dated November 20, 1984. Three days later the Family Court awarded Robert an "absolute" divorce and also approved the agreement. In March 1986 Mary Ann, apparently dissatisfied with the terms of the agreement, filed a complaint in Family Court. In the complaint Mary Ann claimed that Robert induced her to enter into the agreement and that she had relied upon Robert's assurances. As a result Mary Ann sought to vacate the final judgment of divorce and requested that the matter be reinstated for trial.

In November 1986 Robert, through his attorney, filed a motion to suspend alimony payments and to modify child support. Robert claimed that he suffered a heart attack in late August 1984. Furthermore, Robert claimed, since his doctor had advised him to avoid all strenuous activity, he had not worked since the heart attack.

In May 1987 both Robert and Mary Ann entered into a consent decree (decree) that purported to resolve the differences between them. According to the terms of this decree, Robert was to receive exclusive use of and title to property in West Warwick, and Mary Ann was to receive exclusive use of and title to a home in North Providence. Furthermore, Robert agreed to pay off all but $10,000 of the mortgage due on the North Providence home upon receiving a quitclaim deed to the West Warwick property from Mary Ann. In return Mary Ann agreed to release any claim she had to Robert's video business, and both parties waived alimony payments. In addition, Robert agreed to pay $100 per week in child support, based on his earning capacity of $15,600 to $26,000 per year. Finally Mary Ann waived any claims she had to past child support, past alimony, and all other arrearages.

Two days before the decree was filed, Robert sold two vacant lots that were part of the West Warwick property for $90,000. Out of the proceeds Robert paid $7,200 to the Rhode Island Central Credit Union (RICCU) to stop foreclosure proceedings on the North Providence home, and he applied another $23,000 to regenerate his video business. Shortly thereafter, Robert placed his business into receivership and withdrew $18,500 of the $90,000 that he had deposited into an account and placed the money in a new account at a different bank.

In September 1987 Robert refinanced the home, together with one remaining vacant lot in West Warwick. Robert received two checks, one for $64,460.96 and another for $40,000, and $5,000 cash. He placed the $64,460.96 check in the account of his girlfriend, Nancy Buco (Nancy). Robert claimed that he gave the $40,000 check to a

man named Thomas Valentino to pay off a business debt that Robert claimed he owed to unnamed persons who would otherwise harm him. Robert's testimony was later contradicted by one Gale Savastani, who stated that she knew Robert and that she remembered his personally cashing the check at the jewelry company where she worked.

Later that same month Robert conveyed the West Warwick property, consisting of both the house and the vacant lot, to Nancy. Although no money changed hands, the tax stamps indicated a selling price of approximately $300,000. Nancy then gave Robert a mortgage of $70,000. In December 1987 Nancy conveyed the house back to Robert.

Robert then placed the West Warwick house on the market with an asking price of $500,000 and continued to make mortgage, child support, and car payments pursuant to the decree. Robert made these payments out of the $64,460.96 that he had placed in Nancy's account. Robert also testified that he paid his own bills, invested in several business ventures, and paid legal fees out of the money in Nancy's account. The West Warwick house did not sell despite reductions in price, and the payments to Mary Ann stopped in January 1988 when Robert ran out of cash.

In April 1988 Mary Ann once again came before the Family Court. On this occasion she sought a temporary restraining order to prevent RICCU from foreclosing on her North Providence residence. After the repeated granting of thirty-day stays by the Family Court justice, we issued a common-law writ of certiorari to review the temporary restraining order. Subsequently we granted RICCU's petition for certiorari and remanded the matter to Family Court for the sole purpose of allowing Mary Ann a period of not more than ninety days to redeem the property. *Rhode Island Central Credit Union v. Pazienza,* 572 A.2d 296, 298 (R.I.1990).

On July 14, 1988, Robert filed a petition for bankruptcy pursuant to chapter 11 of the Bankruptcy Code and claimed that he was entitled to an automatic stay with re-

spect to the motion to adjudge in contempt in accordance with 11 U.S.C. § 362 (1988).

On January 11, 1989, Mary Ann, through her attorney, moved to add Nancy as a third-party defendant. This motion was based on testimony given by Robert in which he stated that his funds had been commingled with Nancy's funds both before and after their marriage, and that Nancy retained title to one of the West Warwick lots. Mary Ann requested the court to declare the funds in Nancy's account to be held in a constructive trust for the benefit of Mary Ann.

In February 1989 a Family Court justice denied Robert's request for an automatic stay and granted Mary Ann's motion to add Nancy as a third-party defendant. The trial justice then continued the matter for further hearings.

Ultimately the Family Court justice found that Nancy was cognizant of the scheme in which she was involved and that she had knowingly commingled her funds with those of Robert. As a result the Family Court justice imposed a constructive trust upon the West Warwick lot that was held in Nancy's name. The trial justice also granted Robert's motion to modify child support and suspended all payments. However, as Robert was serving a term in federal prison, the trial justice placed sole custody of the child with his mother.

Relying upon these facts, Robert raises three issues that merit our consideration. First, Robert claims that the trial justice erred in not granting an automatic stay of the Family Court proceedings as provided by 11 U.S.C. § 362. Second, Robert contends that the trial justice erred in striking only the cross-examination of Robert. Third, Robert argues that the trial justice erred in changing the custody of the Pazienzas' minor child from joint custody to sole custody in favor of Mary Ann. In addition we shall also consider one issue raised on appeal by Nancy, the third-party defendant; she claims that the trial justice erred when he imposed a constructive trust upon property in Nancy's name.

We shall begin with the first issue raised by Robert. Robert claims that the trial

justice erred in not granting the automatic stay as provided for pursuant to 11 U.S.C. § 362. As noted earlier, Robert filed for bankruptcy one day after a hearing on the motion to adjudge him in contempt for failure to make mortgage payments on the property in North Providence as he agreed to do in the decree.

As a result of filing the bankruptcy petition, Robert argues that the automatic-stay provision halts the proceedings in the Family Court. The relevant provision of the bankruptcy code provides:

"§ 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3)), operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

The House Judiciary Report that accompanies this provision notes that "[t]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his [or her] creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." House Judiciary Report 11 U.S.C.S. § 362 (Law. Co-op.1985).

However, section b(2) of 11 U.S.C. § 362 provides that "[t]he filing of a petition under [title 11] * * * does not operate as a stay * * * under subsection (a) of this section, of the collection of alimony, maintenance, or support from property that is not property of the estate."

The House Judiciary Report further states:

"Paragraph (2) excepts from the stay the collection of alimony, maintenance or support from property that is not property of the estate. This will include property acquired after the commencement of the case, exempted property, and property that does not pass to the estate. The automatic stay is one means of protecting the debtor's discharge. Alimony, maintenance and support obligations are excepted from discharge. Staying collection of them, when not to the detriment of other creditors (because the collection effort is against property that is not property of the estate), does not further that goal. Moreover, it could lead to hardship on the part of the protected spouse or children." House Judiciary Report 11 U.S.C.S. § 362.

The bankruptcy code and the accompanying comments raise two questions that must be answered in order to determine whether the trial justice erred in denying Robert's request for an automatic stay. The first question is whether the mortgage payments on which Robert was delinquent on are alimony, maintenance, or support within 11 U.S.C. § 362(b)(2). The second question is whether the Family Court's denial of the automatic stay will interfere with the exercise of the Bankruptcy Court's jurisdiction.

As a preliminary matter, we turn to *Hopkins v. Hopkins*, 487 A.2d 500, 503 (R.I.1985). In *Hopkins* the Family Court entered a final judgment dissolving the Hopkinses' marriage in February 1981. A section of this judgment stated that the wife would waive alimony in exchange for the husband's assuming liability for certain joint debts that were incurred during the course of the marriage. Shortly thereafter, the husband filed for bankruptcy. The Bankruptcy Court ruled that the joint debts owed to third parties were dischargeable as they could be classified as the result of a property settlement and not an award of alimony. *See In re Hopkins*, 18 B.R. 309 (Bankr. D.R.I.1982).

Subsequent to the proceedings in the Bankruptcy Court, the Family Court held a hearing on the wife's motion to adjudge the husband in contempt for failing to abide by the terms of the final judgment. Whereas the Family Court acknowledged the Bankruptcy Court's discharge of the joint debts, the Family Court required the husband to indemnify the wife if she in turn became liable for any of the joint debts. Thus the issue before us in *Hopkins* was whether the Family Court was precluded from requiring the husband to indemnify his former wife if she were to become liable for any of the debts that the husband was required to pay under the final decree but which were thereafter discharged by the Bankruptcy Court.

In *Hopkins* we went on to note two rules that are applicable to this dispute. The initial rule is that the Bankruptcy Court and the Family Court have concurrent jurisdiction "in matters concerning the dischargeability of debts 'to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree, or property settlement agreement.'" *Hopkins*, 487 A.2d at 503. Second, we noted that whereas the Bankruptcy Court's order is final regarding the relationship between the husband and third-party creditors, the Family Court has jurisdiction over the relationship between the husband and the wife. *Id.* Thus in *Hopkins* we upheld the Family Court's jurisdiction and decision in allowing the wife to be indemnified by the husband.

▆▆ Moving on to the questions mentioned earlier, we turn to the question of whether the mortgage payments that Robert agreed to pay constitute "alimony, maintenance, or support" within the meaning of 11 U.S.C. § 362(b)(2). Clearly they are. That is, " 'the payment of obligations secured by mortgages involves the very essence of family support and maintenance.'" *In re Weidenhammer*, 82 B.R. 383, 384–85 (Bankr. E.D.Pa.1988). The second question is whether the Family Court's determination that an automatic stay is inapposite in this situation will interfere with the Bankruptcy Court's proceedings. We think not. As the payments that Robert owes Mary Ann are not dischargeable in bankruptcy, we are of the opinion that no harm came out from the determinations made on the motion to adjudge Robert in contempt. *See* 11 U.S.C. § 523(a)(5). In addition any interests that might accumulate *after* the filing of the petition are *not* "property of his estate" and fall outside the ambit of the automatic-stay provision. We therefore believe that the trial justice ruled properly in refusing to grant Robert's request for an automatic stay with respect to the motion to adjudge in contempt.

The second issue we shall discuss involves Robert's and Nancy's contentions that the trial justice erred in striking only the cross-examination of Robert while leaving his entire direct testimony. A discussion of the facts leading to this decision of the trial justice is necessary at this time.

This controversy was first heard on July 13, 1988, at which time Mary Ann's motion to have Robert adjudged in contempt was before the trial justice. On that date Mary Ann's attorney called Robert to the stand as an adverse witness. The matter was continued to March 1, 1989, at which time Mary Ann's attorney continued the extensive direct examination of Robert. The direct examination of Robert as an adverse witness ended on April 12, 1989, at which time Robert's attorney began his cross-examination, in an attempt to rehabilitate his client.

Prior to Robert's attorney's completing his cross-examination, however, the court recessed for the day. The matter was then continued to April 25, 1989. On that date Robert failed to appear in court. Subsequently it became known that Robert, apparently overcome with a sense of punctuality, had decided to leave three days early to begin a prison sentence on an unrelated matter.[1]

---

**1.** In March 1989 a United States District Court judge sentenced Robert to eighteen months in prison and a fine of $1,000. The charges consisted of five counts each of wire fraud and

When Mary Ann's attorney was apprised of Robert's unavailability, the attorney moved to strike his cross-examination. Mary Ann's attorney argued that as Robert chose to absent himself from the court, and as there would not be an opportunity for redirect examination based on the partial cross-examination, Robert's partial cross-examination should be stricken from the record. Robert's attorney, on the other hand, argued that as Mary Ann's attorney had elicited damaging evidence on direct examination, absent the ability to cross-examine Robert, the trial justice should strike Robert's entire testimony.

The situation became further complicated by the objection made by Nancy's attorney. Nancy's attorney claimed that as Mary Ann was seeking to impose a constructive trust upon Nancy's funds, Nancy should have the opportunity to cross-examine Robert. Nancy's attorney argued that absent this opportunity, Robert's entire testimony should be stricken. After hearing the three lawyers' arguments, the trial justice opted to strike only the partial cross-examination of Robert.

The issues before the court are twofold. First, did the trial justice err in striking Robert's cross-examination? Second, did the trial justice commit error in imposing a constructive trust upon Nancy's funds notwithstanding the fact that she never had the opportunity to cross-examine Robert?

We begin a discussion of the law by noting the importance of crossexamination. Indeed, in criminal cases the right to cross-examine takes on constitutional implications. That is, the right to effective cross-examination is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10, of the Rhode Island Constitution. *State v. Eckhart*, 117 R.I. 431, 367 A.2d 1073 (1977).

■ The importance of cross-examination extends to civil cases as well. "Wisely employed it is perhaps the most powerful weapon in the arsenal of the lawyer in pursuit of the whole truth." *Treharne v. Callahan*, 426 F.2d 58, 62 (3d Cir.1970). Nevertheless we believe that in civil cases "the right is not so all pervasive that it automatically forecloses the possibility that competing considerations may be of equal magnitude." *Id.* Thus the scope and the extent of cross-examination are within the reasonable discretion of the trial justice; our review is limited to whether the trial justice has abused that discretion. *Burns v. Janes*, 121 R.I. 343, 398 A.2d 1125 (1979); *Dixon v. Royal Cab, Inc.*, 121 R.I. 110, 396 A.2d 930 (1979).

■ Taking Robert's contention first, we note his argument that the trial justice erred in striking the cross-examination commenced by his own attorney. We note that Mary Ann's attorney originally called Robert as an adverse witness. Thus Robert's direct testimony was tantamount to cross-examination. After Mary Ann's attorney completed the direct examination of Robert, Robert's counsel began a rehabilitative cross-examination.[2] Before Robert could finish his cross-examination, the trial justice adjourned court for the day.

As Robert voluntarily absented himself from the continuance, we believe that the trial justice did not err in striking the incomplete cross-examination. Although we believe that the trial justice would not have been wrong to allow the partial cross-examination to remain on the record, in our opinion the trial justice did not abuse his discretion in striking the entire cross-examination. Consequently we deny and dismiss Robert's second contention on appeal.

■ The error that Nancy alleges presents a more difficult problem. The

credit-card fraud, as well as one count of conspiracy to commit credit-card fraud. Robert was originally assigned to serve his sentence in a federal penitentiary in Pennsylvania but was later moved to Texas.

**2.** As noted by one commentator, "The label of the ensuing questioning by the adverse party's own counsel as 'cross-examination' is somewhat of a misnomer. Counsel may not ask leading questions. The cross-examination is confined to those matters covered on the adverse examination, though the witness is permitted to explain his adverse testimony." 1 Lane, *Goldstein Trial Technique* § 11.82 (3d ed.1984).

trial justice imposed a constructive trust on property in Nancy's name, yet Nancy never was given the opportunity to cross-examine Robert. In spite of the persuasive nature of Nancy's arguments, we nevertheless believe that the trial justice did not commit error in imposing a constructive trust in favor of Mary Ann.

In support of our determination we initially note that Nancy and Robert were first girlfriend and boyfriend and then wife and husband. Nancy was allowed to testify and corroborated Robert's testimony on direct examination. That is, Nancy testified that she had held Robert's money in her account, that she had lived with Robert, and that she had shared both expenses and incomes with Robert. In summary Nancy testified that the couple's funds were commingled.

In addition, as between two parties to whom harm is caused by a third party, we believe that the harm should be borne by the less innocent party. That is, given the circumstances in which Robert leaves the state in the middle of his cross-examination, as the situation exists between Mary Ann and Nancy, Mary Ann should not be penalized for Robert's absence. Indeed, when one considers the relationship between Robert and Nancy, as well as Nancy's knowledge of Robert's practices, one cannot dismiss the possibility that a conspiracy did exist between Robert and Nancy. We therefore believe that the trial justice did not commit error in imposing a constructive trust upon Nancy's funds.

The final issue concerns Robert's argument that the trial justice erred in determining that it was in the child's best interest for Mary Ann to have sole custody of the child. Robert contends that there was no motion pending before the trial justice requesting a change in custody and that the trial justice sua sponte changed the joint custody to sole custody in favor of Mary Ann.

In resolving this issue, we turn to the case of *Santos v. Santos*, 568 A.2d 1010 (R.I.1990). In *Santos* the husband filed a motion to modify a support order that fol-lowed a divorce. Upon hearing the husband's motion to decrease support, the trial justice issued an order increasing the support payments. On the petition for certiorari we quashed the order increasing the amount of support from the husband to the wife.

In *Santos* we noted that both parties came before the trial justice with the expectation and for the purpose of arguing a motion to decrease support. Given that fact, the husband "found himself in the precarious situation of defending against what amounted to an entirely unexpected determination on the part of the trial justice to increase the support paid by the husband." 568 A.2d at 1011. Thus in *Santos* we rejected the trial justice's sua sponte consideration and ruling on the motion for an increase of support. *Id.*

In the matter before us the trial justice considered the changing of custody of the Pazienzas' minor child. Although we do not doubt that given Robert's incarceration, the change in custody could well have been in the best interest of the child, we believe it was improper for the trial justice to rule on such a matter sua sponte. Therefore, we believe that the trial justice was in error for considering and ruling on the motion for a change in custody.

After considering the issues that we deemed merited discussion, this court is of the opinion that the sole error committed by the trial justice concerned the custody of the Pazienzas' minor child. Consequently we vacate the order modifying custody and remand this matter to the Family Court for a hearing on the custody of the minor child. We deny and dismiss Nancy's appeal, as well as Robert's appeal, insofar as it relates to the denial of the automatic stay and the striking of the partial cross-examination.