STATE

v.

**Marvin J. WILEY.**

**No. 95-54-MP.**

Supreme Court of Rhode Island.

May 21, 1996.

Jane McSoley, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

Paula Rosin, Asst. Public Defender, Janice Weisfeld, Asst. Public Defender, for Defendant.

**OPINION**

BOURCIER, Justice.

This case comes before us on the defendant Marvin J. Wiley's (Wiley) petition for certiorari, seeking review of his March 21, 1989 judgment of conviction following jury verdicts of guilty on six counts of child abuse. Wiley asserts that he was denied rights guaranteed him by the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. Specifically, he claims that he is entitled to reversal of his convictions and to a new trial because he was prevented by the trial justice from cross-examining one of his accusers in an area of inquiry that he believed was consistent with his theory of defense. For the reasons that follow, we deny the petition for certiorari and remand the papers in this case to the Family Court.

The charges against Wiley stemmed from allegations by his two biological sons and his stepdaughter that he treated them in a most brutal manner. An incident on May 19, 1987, served as the catalyst for the criminal proceedings initiated against him by the state. On that date, as the three children, Robert,

Martin, and Cheryl,[1] were preparing for school, defendant began striking Martin, who was fourteen years of age at the time. One of Wiley's blows caused Martin to lose his balance and fall against a wall. This action, in turn, dislodged a picture from the wall, which then fell on Martin, leaving a cut on his forehead. Wiley instructed his sons to tell anyone at their school inquiring about the bruises on Martin's face that the two boys had been fighting.

When Martin arrived at school, his teacher did notice the facial bruises and the cut forehead and sent him to the school's nurse, Carol Ann Barbato (Barbato). The nurse testified at defendant's trial that Martin had indeed first claimed that the abrasions on his face had resulted from fighting with his brother, but he also then stated that their father had separated and beaten the two of them. Barbato testified that she then sent for Robert, and when she noticed that he did not appear to have been in a fight, she contacted the Department for Children and Their Families (DCF).[2] A DCF caseworker arrived at school and took the children to Newport Hospital. The three children were later placed in the care and custody of DCF.

A few days after they had been removed from the Wiley home, an investigator for DCF, Sue Sams (Sams), interviewed the children. She learned of previously unreported incidents of abuse to the children. According to the investigator's trial testimony, each of the children revealed to her that he or she had been beaten by defendant. One incident, as related by Cheryl to Sams, was that she had been struck in the back of her head by the defendant, the force of the blow causing her head to then hit a washing machine, which later left a scar above her eye. According to Sams, Cheryl also told her that the defendant had bitten her on the arm, and had once thrown her across a room and then proceeded to hit her on the back of her head with "the shovel stick."[3] After interviewing the children, Sams testified that she ar-

ranged a meeting with Wiley and his wife at a DCF office in Providence. During this meeting, when defendant was confronted with the children's allegations of abuse, Sams testified that, "Mr. Wiley's only comment to each and every one [of the allegations] was to either laugh or say nothing."

As events later unfolded during the course of his trial on the various charges, the defendant added or said nothing of substance. This was due in part to the fact that he failed to appear for the second and third days of the trial proceedings and a warrant for his arrest was issued to bring him before the Family Court for sentencing after his convictions. Wiley's explanation regarding the reason for his absence from the court trial is not clearly reflected by the record. However, it is not unreasonable for us to assume that Wiley's peregrination on the second day of his trial was based upon the damning evidence he had heard during the opening-day trial testimony. In part, he had listened to testimony from his son Robert recounting the abuse the defendant had freely and frequently doled out upon his children. The defendant because of his absence did not avail himself of the opportunity, during the second and third days of his trial, to watch and listen to the testimony of his other two children regarding his abuse of them. In any event, for the purposes of this appeal, the first-day testimony of his youngest son, Robert, is most germane.

Robert, fourteen at the time of trial, testified that his father struck him and his siblings often, and with a variety of objects, including his hands, belts, extension cords, the "shovel stick," and the "Black Beauty." This last implement used to inflict pain was described by Robert as "a big stick wrapped in black tape with the gold letters 'Black Beauty' written on it." Robert also testified that his father would beat the children on the arms, legs, and head with "Black Beauty." The basic theme of Robert's testimony could be characterized by his statement, "[a]lmost

---

1. The names of the victims in this case, who were all juveniles at the time of defendant's trial, have been changed in order to protect their identities.

2. The department is now known as the Department of Children, Youth, and Families. *See* G.L. 1956 § 42–72–1.

3. The shovel stick was described as the handle of a shovel with the blade of the tool removed.

every day he [defendant] found a reason to beat either me, [Martin] or [Cheryl]." He related several other such occurrences of the defendant's brutal abuse.

The defendant's theory of defense was not to deny that he had beaten his children, but instead was that he struck the children because he was a strict disciplinarian. Defense counsel, in his opening statement, set the theme for that defense in remarking that, "[w]ith so much widespread violence, drug use, one-parent families, it is good that we have fathers that will discipline their children and keep them on the straight and narrow." Having embarked upon that course of defense, Wiley's counsel sought during cross-examination of Robert to elicit admissions of misbehavior from Robert that, presumably, would justify his father's efforts to "discipline" him.[4] On appeal, defendant claims that the trial justice erred in curtailing defense counsel's probing for Robert's incidents of misbehavior at his school, and his restriction of defense counsel's cross-examination violated his federal and state constitutional rights to confront and cross-examine a witness against him.

█ During the cross-examination of Robert, the record reveals that the following took place:

"Q Were you ever—did you ever have much trouble in school as far as disobedient behavior, lying to your teachers, or anything like that?

"A Yes.

"Q Okay, how often were you in trouble at school?

"Ms. Nagle: Objection.

"The Court: How is it relevant?

"Mr. Jones: I'm trying to show a pattern of nonveracity on the witness's part.

"The Court: You can't show a pattern in that manner.

"Mr. Jones: I'll rephrase the question, Your Honor.

"The Court: Objection sustained.

"Q How many . times——were you ever suspended from school?

"Ms. Nagle: Objection.

"The Court: Sustained.

"Q Were you ever disciplined by your father due to things that you did in school?

"A Yes.

"Q Okay, and what type of things did you do in school that caused him to discipline you?

"A I found some toothpaste on the bus, and I took the toothpaste and I squeezed it, and it went on the back of the bus.

"Q Are you familiar with Mr. Rudy Boigetta (phonetic spelling)?

"A Yes.

"Q Okay, how many times have you been into his office?

"Ms. Nagle: Objection.

"The Court: Objection sustained."

At this point, defense counsel moved on to another line of questioning. On appeal it is now argued that the trial justice's refusal to allow his counsel to inquire into, the number of instances that Robert was in trouble at school, and into the question of whether he was suspended from school, and regarding how many times Robert was in the office of the vice principal (Mr. Boigetta), constituted a violation of his constitutional rights to confront the witness against him as guaranteed by the Federal and State Constitutions.

In applicable part, the Sixth Amendment to the United States Constitution mandates that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * * ." Article 1, section 10, of the Rhode Island Constitution contains the similar dic-

---

4. It should be noted that defendant, *for the first time on appeal*, also claims that the cross-examination of Robert (and the anticipated examination of the other children) was intended to show that the son was biased against his father as a result of the alleged disciplinary beatings he received, and therefore would have a motive to fabricate incidents of severe abuse. Although defendant argues here that during defense counsel's opening statement he "inferentially" preserved this reason for the cross-examination questions, we can find no such inferential support from the record of the proceedings below. We therefore find that this argument is not properly before this court on review, and we further note that even if it had been so properly maintained, it would not require reversal of defendant's convictions.

tate: "In all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them * * * ." We have held many times that, "[i]ncluded in the right to confront witnesses is the fundamental right of the criminal defendant to cross-examine his or her accusers." *State v. Olsen,* 610 A.2d 1099, 1101 (R.I.1992). *See also State v. Texter,* 594 A.2d 376, 377 (R.I.1991); *State v. Canning,* 541 A.2d 457, 461 (R.I.1988); *State v. Manocchio,* 523 A.2d 872, 874 (R.I.1987). We have further often stated, "it is the essence of a fair trial that reasonable latitude be given the cross-examiner." *State v. Vento,* 533 A.2d 1161, 1164 (R.I.1987) (quoting *State v. Anthony,* 422 A.2d 921, 924 (R.I.1980)).

However, recognizing these principles, it has also been held that once sufficient cross-examination has been allowed, that satisfies the confrontation requirement and any further cross-examination on the particular subject matter is left within the sound discretion of the trial justice. *Vento,* 533 A.2d at 1164. *See also State v. Sifuentes,* 649 A.2d 500, 502 (R.I.1994). The trial justice is afforded this discretionary latitude so that he or she may limit cross-examination on the basis of concerns of witness harassment, jury prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. *Vento,* 533 A.2d at 1164 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

■ The defendant contends here that his trial counsel was unconstitutionally restricted from adequately cross-examining his son Robert regarding Robert's school-related misbehavior. Although the trial justice sustained the state's objections to defense counsel's questions concerning the frequency of Robert's "trouble at school," the question of whether Robert was ever suspended from school, and the number of times Robert had been in the vice principal's office, defense counsel had been permitted by cross-examination to establish that Robert had been involved in incidents of disobedience at school and had been disciplined because of them. We believe that the trial justice did not err in restricting defense counsel's inquiry regarding the number of times that Rob-

ert had been in trouble at school or his suspension status. The trial justice allowed defense counsel sufficient latitude in which to bring out the instances of Robert's troubles at school, and defense counsel's further exploration in that area would have been simply cumulative. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Vento,* 533 A.2d at 1164 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15, 19 (1985) (per curiam)). Cross-examination, like drilling for oil, has one basic tenet in common—once the cross-examiner strikes oil, he or she should stop boring.

■ As a final matter, we conclude that even if we were to accept defendant's contention that the trial justice erred in limiting cross-examination of Robert, such error was harmless.

This Court has adopted the analysis enunciated by the United States Supreme Court concerning application of the harmless-error standard to cases in which there is a violation of a defendant's constitutional right to cross-examination. *Texter,* 594 A.2d at 378 (citing *Van Arsdall, supra* ). This analysis is utilized in cases where there has been an impermissible restriction of the right of cross-examination. In making our determination regarding whether the restriction, if any, in this case was, in fact, harmless error, we look to "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and * * * the overall strength of the prosecution's case." *Texter,* 594 A.2d at 378 (quoting *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686–87). After assessing those factors in their totality, we are not able to determine that it is clear beyond a reasonable doubt that the restricted line of inquiry would have weakened the impact of Robert's testimony. *Texter,* 594 A.2d at 378. *See also State v. DeBarros,* 441 A.2d 549, 552 (R.I.1982). We

cannot perceive on the facts before us anything in the record concerning the incident of Robert's squeezing of a tube of toothpaste on the school bus that would justify the beating he took from Wiley.

Considering the *Texter* harmless-error factors, in toto, we conclude that although defendant's son Robert's testimony was important to the prosecution's case (since his allegations of abuse comprised two of the six criminal counts), defense counsel was in fact permitted to adequately cross-examine the child to a reasonable extent concerning his allegations. This opportunity included, as stated above, the elicitation of instances of Robert's misbehavior at school and the resulting discipline that was meted out to him. Further, Robert's siblings, Martin and Cheryl, testified during the trial to many of the same occurrences of abuse that had been related by Robert during his testimony. Those episodes of regular abuse, as testified to by Martin and Cheryl, served to corroborate strongly the material aspects of Robert's testimony regarding the cruelty inflicted upon the three children by the defendant. That corroborating testimony was more than sufficient to justify the trial jury's findings. In addition to the testimony of the three children, the trial jury also had before it evidence from (1) the children's school nurse (Barbato), who observed bruises on Martin's face inconsistent with the child's story, and who was eventually told that the boy's father beat him, and (2) the DCF case worker (Sams), who was told by all three children of the numerous instances of abuse as perpetrated by their father.

For the above reasons, the defendant's petition for certiorari is denied and the writ heretofore issued is quashed. The judgment of conviction is affirmed and the papers in the case are remanded to the Family Court with our decision endorsed thereon.

FLANDERS, J., did not participate.