STATE

v.

**Robert SILVIA.**

No. 2004–142–C.A.

Supreme Court of Rhode Island.

May 31, 2006.

Virginia McGinn, Esq., Providence, for Plaintiff.

Janice Weisfeld, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Robert Silvia, appeals from a jury verdict finding him guilty of the second-degree murder of Joseph Lima. As a result of this conviction, the defendant was sentenced to a term of sixty years—forty years to be served at the

Adult Correctional Institutions and twenty years suspended, with probation.

On appeal, defendant argues that the trial justice erred in (1) restricting defense counsel's cross-examination of a particular witness; (2) admitting into evidence Mr. Lima's bloody and cut clothing and also admitting testimony by a paramedic as to resuscitative efforts undertaken on Mr. Lima while en route to the hospital; and (3) denying defendant's motion *in limine* whereby he sought to preclude evidence of his prior convictions from being used for impeachment purposes if he chose to testify.

For the reasons set forth herein, we affirm the judgment of conviction.

## Facts and Travel

On Friday, November 30, 2001, Joseph Lima died as a result of a stab wound to his abdomen. In the hours immediately preceding his death, Mr. Lima had been a patron at the Somewhere Else Bar, located at 22 Earle Street in Central Falls. According to the testimony of Margaret White, a long-time bartender at the bar, both Mr. Lima and defendant were "regulars" at the establishment, each coming into the bar three or four times a week.

Ms. White testified that, when she started her shift at 4 p.m. on November 30, 2001, defendant and his roommate, one Steven Santos, were already in the bar. Ms. White testified that defendant was playing pool and Mr. Santos was seated at the bar. Ms. White further testified that Mr. Lima came into the bar around 5 or 5:30 that evening.

According to the testimony of Ms. White, later that evening, after the bar had filled up, Mr. Santos started to "get loud" and began waving his arms in the air, as was his tendency. Ms. White testified that Mr. Santos almost burned the man standing next to him (one Warren Dolan) with the cigarette which Mr. Santos was holding and then almost knocked over the man's drink. Ms. White testified that at that point she told Mr. Santos to calm down. Ms. White further testified that Mr. Dolan told her not to worry about it, took his drink, and moved to the far left end of the bar.

Ms. White further testified that, as she continued serving other customers, she saw Mr. Santos call defendant over from the pool table and tell him something. According to Ms. White's testimony, defendant then approached the bar and started screaming and swearing at her. Ms. White testified that defendant accused her of having singled out Mr. Santos and having told him to "shut up." She further testified that defendant then slammed his beer bottle down on the bar in front of her, causing some beer to come out of the bottle and splash upon her. Ms. White testified that she was unable to calm defendant down and that he continued to scream at her for two to three minutes.

Ms. White testified that Mr. Lima, who had been sitting at the right end of the bar, stood up and told defendant that he should not disrespect Ms. White in that way. According to the testimony of Ms. White, Mr. Lima and defendant started yelling back and forth, but Mr. Lima never left the corner of the bar where he had been sitting.[1] Ms. White testified that she

---

1. It appears from the record that, during a pretrial hearing, Ms. White had testified that Mr. Lima had advanced about three feet towards defendant and that four or five people had to hold him back. At trial, however, Ms. White testified that Mr. Lima never left the

corner of the bar where he had been sitting and took, at most, one step towards defendant. Ms. White also testified at trial that, although there were four or five people in the corner where Mr. Lima was sitting, they did

then told defendant that she thought he should leave; she said that defendant then retrieved his bicycle, which he had brought into the bar, and left. Ms. White further testified that Mr. Santos left the bar approximately ten to fifteen minutes after defendant had departed. Ms. White estimated that her encounter with defendant took place at approximately 6:30 or 7 p.m. on November 30.

According to Ms. White's testimony, about ten minutes after defendant had left the bar, he called the bar on the telephone. Ms. White testified that when she answered the phone defendant started screaming at her again. Ms. White testified that she tried to calm defendant down and talk to him about what was wrong, but that "he wasn't hearing" her. Ms. White testified that, rather than calming down, defendant told her that he was coming back that night to burn the bar down with her inside of it—at which point she hung up the phone. Ms. White further testified that defendant then called the bar again, and, when she answered the phone, he said in a very calm voice: "Hi, it's me again." According to the testimony of Ms. White, she immediately hung up the phone and called Kathleen Ash, who owned the bar and lived upstairs, and she asked Ms. Ash to come downstairs because there was a problem in the bar.

Ms. Ash testified that she went downstairs to the bar immediately after receiving the telephone call from Ms. White at approximately 7:30 or 7:45 p.m. Ms. Ash testified that Ms. White sounded nervous and scared on the telephone while informing her that defendant had called the bar twice and threatened to burn it down.

Ms. Ash further testified that, after going downstairs and talking with Ms. White, she left her bar and, in an attempt to find Mr. Santos, went to Destiny's Bar. The latter establishment was located around the corner from the Somewhere Else Bar—on the corner of Richardson Street and Pine Street. According to the testimony of Ms. Ash, she knew that Mr. Santos sometimes frequented Destiny's Bar and she wanted to ask Mr. Santos some questions about defendant's behavior. Ms. Ash testified that, as she was walking from the Somewhere Else Bar to Destiny's Bar, she found herself being accompanied by Mr. Lima. Ms. Ash further testified that she told Mr. Lima that she did not need him to come with her, but he followed her to Destiny's Bar anyway. According to Ms. Ash's testimony, she found Mr. Santos at Destiny's Bar, but he indicated that he did not know anything about why defendant was upset.

Ms. Ash testified that she then left Destiny's Bar because Ann Pike (a co-worker of Mr. Lima's who had been at the Somewhere Else Bar with him that night) came in and told her that defendant was riding his bicycle back and forth in front of the Somewhere Else Bar. Ms. Ash testified that, when she was almost back to her bar, she saw defendant in the parking lot across the street. According to the testimony of Ms. Ash, defendant was straddling his bicycle and Mr. Dolan was standing in the parking lot facing him. Ms. Ash testified that she approached defendant and "asked him what his problem was." Ms. Ash further testified that defendant responded by apologizing; she said that he then kept repeating that he was sorry.

According to Ms. Ash's testimony, Mr. Lima suddenly appeared, and the next thing she remembered was seeing Mr. Lima stumbling near a van that was parked on the left side of the parking lot. Ms. Ash testified that Mr. Lima, who was

not block Mr. Lima and he could have come out of the corner if he had wanted to do so.

bent over and holding his stomach, stumbled into the middle of Earle Street, where he fell to the ground. Ms. Ash further testified that she approached Mr. Lima and observed that one Sharon Pickett (whom Ms. Ash identified at trial as Mr. Lima's fiancée) was there. Ms. Ash added that "[Mr. Lima] said he was stabbed [and Ms. Pickett] pulled up his shirt and his insides were coming out." Ms. Ash then testified that she pulled Mr. Lima's shirt back down and applied pressure to his abdomen until the rescue squad arrived a few minutes later.

Warren Dolan also testified at trial regarding the events leading up to Mr. Lima's death. According to Mr. Dolan's testimony, upon his arrival at the Somewhere Else Bar at approximately 5 p.m. on November 30, he sat at the middle of the bar next to Mr. Santos. Mr. Dolan testified that he remained seated next to Mr. Santos until Mr. Santos almost burned him with his cigarette—at which point he got up and moved away from Mr. Santos to the end of the bar. Mr. Dolan further testified that, as he was moving to his new seat, he heard a bang on the bar; and, when he looked to see what had happened, he noticed that the shirt of Margaret White, the bartender, was all wet. Mr. Dolan testified that he then observed defendant standing at the bar facing Ms. White with a pool stick in his hand. According to Mr. Dolan's testimony, defendant looked upset and angry and was talking loudly. Mr. Dolan testified that he walked over to defendant and asked for the pool stick that he was holding because he "didn't want to see any altercation." Mr. Dolan testified that defendant gave him the pool stick and that he told defendant, "I think you should leave" and that defendant then left the bar.

Mr. Dolan testified that he was present in the bar when Ms. White received two telephone calls from defendant. After listening to the first of the calls, Ms. White told Mr. Dolan that defendant had threatened to burn down the bar. Mr. Dolan further testified that, at some later time, he heard people who were outside of the bar say that defendant was back. Mr. Dolan then went outside and, according to his testimony, he saw defendant riding his bicycle around in a circle on the street. Mr. Dolan returned to the bar after watching defendant for approximately thirty to forty seconds, but he later went back outside when he saw defendant in the parking lot across the street from the bar. According to Mr. Dolan's testimony, he went to the parking lot where defendant was in order to talk to him about the telephone calls that he had made to the bar. Mr. Dolan testified that defendant admitted that he had made the telephone calls to the bar and that he had threatened to burn the bar down. Mr. Dolan further testified that defendant was straddling the bicycle at that point and that he was standing in front of the bicycle with the front tire between his legs and his hands resting on the handlebars.

Mr. Dolan further testified that, at some point during his conversation with defendant, Ms. Ash approached from behind the place where he was standing and started screaming at defendant and asking him why he had threatened to burn her bar down. Mr. Dolan further testified that Mr. Lima approached them "maybe a minute or so" later. Mr. Dolan described what happened next as follows: "[L]ike hands reached over me and hands up in the air and then all I remember, the Defendant jumped off his bike" and moved "[t]o the left."[2] Mr. Dolan further testi-

---

2. During direct examination, Mr. Dolan testi-

fied that he did not know whose hands

fied in these words: "[A]ll I seen after that was [defendant's] knee come up and he's like punched Joe [Lima] towards the groin in the stomach." Mr. Dolan testified that, after being hit, Mr. Lima "went down on one knee" and defendant ran out of the parking lot towards Dexter Street, with Mr. Dolan pursuing him for a while. Mr. Dolan further testified that it did not appear to him that Mr. Lima ever made physical contact with or had his hands on defendant.[3]

Victor Estrada, who lived diagonally across the street from the Somewhere Else Bar and next door to the parking lot where the stabbing occurred, witnessed the incident from his backyard. Mr. Estrada testified that, after returning home from work at approximately 7 p.m. on November 30, he went outside to work on his car. While working on his car, Mr. Estrada testified, he heard the owner of the bar and a young man arguing in the parking lot next door. Mr. Estrada testified that, looking through the chain link fence which separated his backyard and driveway from the neighboring parking lot, he saw the bar owner and the young man facing each other, with the young man standing with his bicycle between his legs. Mr. Estrada testified that an older man then came over and told the young man not to talk to the owner of the bar in the manner in which he was speaking to her. According to Mr. Estrada's testimony, the young man then dismounted from his bicycle and went towards the older man. Mr.

Estrada further testified that the older man was backing away from the younger man while the younger man was moving towards the older man and throwing punches at him. Mr. Estrada testified that the older man then said something like "Do you want to fight me?" and opened his arms, and the younger man punched him on his lower abdomen. Mr. Estrada further testified that the older man then leaned over and placed his hands on his stomach and started backing up towards Earle Street, while the younger man ran towards Dexter Street. According to Mr. Estrada's testimony, the older man never reached out towards the younger man or hit the younger man during this altercation, but instead was backing away from the younger man.[4]

Catherine Dolan, Warren Dolan's wife and the only defense witness, gave testimony regarding the altercation between Mr. Lima and defendant that was somewhat at variance with the testimony given by Mr. Estrada. Ms. Dolan, who had been at the Somewhere Else Bar with her husband that evening, testified that she walked out of the bar and into the parking lot across the street as Ms. Ash was yelling at defendant. Ms. Dolan testified that, as she was standing in the parking lot with Mr. Dolan and Ms. Ash and defendant, Mr. Lima quickly came over to where they were gathered. Ms. Dolan further testified that Mr. Lima appeared upset and said something about "disrespect" as he

reached over him. On cross-examination, however, Mr. Dolan testified that it was Mr. Lima's arms that reached over him towards defendant.

**3.** It appears from the record that Mr. Dolan had previously testified at a pretrial hearing that he saw Mr. Lima's arms on defendant during this altercation. At trial, however, Mr. Dolan could not recall having given such testimony. Mr. Dolan admitted at trial that he

had told the police, in his statement of November 30, 2001, that Mr. Lima had his hands on defendant.

**4.** Mr. Estrada testified on direct examination that there was a period of about fifteen seconds during the altercation when his view of the two men was obstructed by a truck that was parked in the parking lot.

approached. Ms. Dolan testified as follows:

> "[Mr. Lima] approached [defendant], [and defendant] dropped the bike and then they started—[Mr. Lima] was going forward, [and defendant] was going backwards and they started heading to the area between the truck and the car."

From her vantage point, Ms. Dolan testified, all she could see after that was Mr. Lima's back and very little of defendant; she could not see defendant's movements and did not see Mr. Lima move his hands. Ms. Dolan testified that, very quickly thereafter, Mr. Lima "just grabbed his abdomen and he doubled over." According to Ms. Dolan's testimony, Mr. Lima then walked towards Earle Street, saying at some point that he had been stabbed.

Michael Bessette, a member of the Central Falls rescue squad which responded to the scene, testified that, upon his arrival at approximately 8:20 p.m., he found a man lying in the middle of Earle Street with a stab wound to his upper abdomen. Mr. Bessette testified that the wounded man (Mr. Lima) was conscious when he arrived, but had become "pulseless" by the time they arrived at Rhode Island Hospital approximately seven minutes later. Mr. Bessette further testified about the efforts to resuscitate Mr. Lima that were undertaken while the rescue vehicle was en route to the hospital.

Doctor Elizabeth Laposata, Chief Medical Examiner for the State of Rhode Island, who performed the autopsy on Mr. Lima, testified that Mr. Lima bled to death as a result of a stab wound to the abdomen, which injured his aorta.

While he was leaving the scene of the stabbing, defendant was arrested by Sergeant Kevin Guindon, a member of the Central Falls Police Department. Captain John Desmarais, a member of the Central Falls Police Department who assisted in the investigation of the stabbing of Mr. Lima, testified that he photographed and processed defendant for fingerprints when defendant arrived at the Central Falls police station on the night of November 30, 2001. Captain Desmarais testified that he did not observe any injuries on defendant's person while he was processing him.

After a jury trial in Superior Court, defendant was found guilty of the murder of Joseph Lima in the second degree. The defendant's motion for a new trial was denied on July 17, 2003; and, on September 2, 2003, he was sentenced to a term of sixty years—forty years to be served at the Adult Correctional Institutions and twenty years suspended, with probation.

On appeal, defendant argues that the trial justice erred in (1) limiting defense counsel's cross-examination of Victor Estrada; (2) admitting into evidence Mr. Lima's bloody and cut clothing and also admitting testimony by Michael Bessette about efforts to resuscitate Mr. Lima while he was being transported to Rhode Island Hospital; and (3) denying defendant's motion *in limine* to exclude evidence of his prior convictions.

## Analysis

### I

### The Cross–Examination of Victor Estrada

■ The defendant's first argument on appeal is that the trial justice erred in restricting the cross-examination of Victor Estrada by defense counsel. The defendant points to four instances in which he contends that the trial justice unduly restricted defense counsel's cross-examination of Mr. Estrada, thereby allegedly violating his constitutional rights to confront and cross-examine. Specifically, defendant argues that the trial justice erred in restricting his cross-examination of Mr. Es-

trada with regard to (1) the location in the parking lot where Ms. Ash and defendant were standing at the time when Mr. Estrada observed them in an apparent argument; (2) the length of time during which Ms. Ash and defendant argued; (3) the length of time during which Mr. Estrada's view of defendant and Mr. Lima was obstructed; and (4) Mr. Estrada's characterization of how defendant's bicycle ended up on the ground.

▇ It is well settled that a trial justice's rulings as to the permissible scope and extent of cross-examination will be overturned on appeal only upon a clear showing of abuse of discretion and prejudice to the moving party. *See State v. Motyka*, 893 A.2d 267, 280 (R.I.2006) ("A trial justice's determination as to the permissible scope of cross-examination is also given deference and will be disturbed on appeal only upon a clear showing of abuse of discretion and only if it constitutes prejudicial error."); *State v. Jimenez*, 882 A.2d 549, 552 (R.I.2005) ("This Court reviews evidentiary rulings concerning the scope and extent of cross-examination only for abuse of discretion and only when the ruling has caused prejudice to the moving party."); *State v. Gordon*, 880 A.2d 825, 838 (R.I.2005) ("A trial justice's determination as to the permissible scope of cross-examination is discretionary and will not

be disturbed by this Court unless that discretion was clearly abused and constituted prejudicial error.").[5]

After carefully reviewing the record in the present case, it is clear to us that the trial justice did not abuse his discretion in making the challenged evidentiary rulings that placed some restrictions on defense counsel's cross-examination of Mr. Estrada. Looking one at a time at the four instances challenged by defendant, it is our opinion that the trial justice was well within his discretion in limiting the scope and extent of defense counsel's cross-examination of Mr. Estrada in each instance. The record quite clearly indicates that defendant was afforded a genuinely meaningful and broad opportunity to use the potent tool of cross-examination[6] in an effort to give the jury reasons to look askance at Mr. Estrada's direct testimony; and, in our judgment, the four above-referenced evidentiary rulings did not materially detract from the overall effectiveness of the cross-examination of Mr. Estrada.[7] It is clear to us that the trial justice restricted defense counsel's cross-examination of Mr. Estrada only to a minute extent, and we fail to perceive how any of the questioned evidentiary rulings was so clearly improper as to constitute an abuse of discretion. Accordingly, we hold that there was no reversible error in the trial justice's rul-

5. We are keenly aware that "[t]he [S]ixth [A]mendment to the United States Constitution guarantees an accused the right of confrontation in all criminal matters and the right to an effective cross-examination is part of one's [S]ixth [A]mendment right." *State v. Eckhart*, 117 R.I. 431, 434, 367 A.2d 1073, 1075 (R.I.1977); *see also State v. Brown*, 709 A.2d 465, 473 (R.I.1998). At the same time, however, it is well established that the trial justice retains substantial discretionary control with respect to the cross-examination process. *See Eckhart*, 117 R.I. at 435–36, 367 A.2d at 1075; *see also State v. Bettencourt*, 723 A.2d 1101, 1109–10 (R.I.1999).

6. *See* 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1367 at 29 (3d ed. 1940) ("[Cross-examination] is beyond any doubt the greatest legal engine ever invented for the discovery of truth.").

7. Even if we consider the four challenged instances as a totality, it is our view that the trial justice's restrictions on the cross-examination of Mr. Estrada still did not amount to an abuse of discretion.

ings limiting the cross-examination of Mr. Estrada.

## II

### The Admission of Certain Items of Clothing as Trial Exhibits and the Admission of the Testimony of Michael Bessette

The defendant's second argument on appeal is that the trial justice erred in admitting into evidence the bloody and cut clothing that Mr. Lima was wearing at the time of the stabbing and also in admitting testimony by Michael Bessette as to the resuscitative efforts undertaken on Mr. Lima while en route to the hospital.[8] The defendant argues that both Mr. Lima's bloody and cut clothing and Mr. Bessette's testimony were irrelevant in view of the fact that he did not deny that he had fatally stabbed Mr. Lima on the night in question, but rather contended that he had done so in self-defense. The defendant also argues that, even if Mr. Lima's clothing and the testimony of Mr. Bessette are deemed to be marginally relevant, this evidence was more prejudicial than probative and thus should have been excluded under Rule 403 of the Rhode Island Rules of Evidence.

■ Rule 402 of the Rhode Island Rules of Evidence provides that all relevant evidence is generally admissible, unless the evidence is excluded by virtue of a provision of the United States or Rhode Island Constitutions, a federal or state law, a court rule, or a rule of evidence. *State v. Aponte,* 649 A.2d 219, 223 (R.I.1994). The determination of whether evidence is relevant is confided to the sound discretion of the trial justice, and our review of such a decision is limited to determining whether there was an abuse of that discretion in a particular instance. *E.g., State v. Pena–Rojas,* 822 A.2d 921, 924 (R.I.2003) ("Decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice; this Court will not disturb those decisions on appeal absent an abuse of discretion."); *State v. Botelho,* 753 A.2d 343, 350 (R.I.2000) ("Decisions about the admissibility of evidence on relevancy grounds are left to the sound discretion of the trial justice. * * * We shall not disturb such a decision on appeal absent an abuse of discretion."); *Aponte,* 649 A.2d at 223 ("The determination of whether evidence is relevant is within the sound discretion of the trial justice, whose relevancy finding will not be overturned except for an abuse of discretion.").

■ Even relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice to defendant. R.I. R. Evid. 403; *see also State v. O'Brien,* 774 A.2d 89, 107 (R.I.2001); *Aponte,* 649 A.2d at 223; *Wells v. Uvex Winter Optical, Inc.,* 635 A.2d 1188, 1193 (R.I.1994). As is true with the determination of whether evidence is relevant, the issue of whether evidence should be excluded pursuant to Rule 403 is also a matter confided to the sound discretion of the trial justice. *E.g., State v. Kaner,* 876 A.2d 1133, 1134 (R.I. 2005) (mem.) ("[T]he issue of whether otherwise relevant evidence should be excluded pursuant to the provisions of Rule 403 is also left to the sound discretion of the trial justice."); *Aponte,* 649 A.2d at 223 ("The ultimate determination of the effect of evidence lies in the discretion of the trial justice."). Accordingly, we will not disturb such a determination on appeal absent an abuse of discretion.

---

**8.** It will be recalled that Mr. Bessette was one of the members of the Central Falls rescue squad which responded to the scene of the stabbing on the evening of November 30, 2001.

In the present case, defendant argues that the clothing worn by Mr. Lima and the testimony of Mr. Bessette were irrelevant because it was undisputed that he had fatally stabbed Mr. Lima. It is well settled, however, that "[w]hen the state prosecutes a defendant, it carries the burden of proving every element necessary to the charge beyond a reasonable. doubt, even if some of those elements may not be disputed." *State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993); *see also State v. Barnes,* 777 A.2d 140, 143–44 (R.I.2001) (holding, in the context of a sexual assault charge, that "the state was required to prove beyond a reasonable doubt the first basic and essential element of the offense, namely, that an act of intercourse involving [the victim] had occurred" and further stating that "[t]hat fact had to be proved even if the defendant was not disputing that particular element of the offense"); *State v. Carter,* 744 A.2d 839, 847 (R.I.2000) (stating, while ruling on the relevance of crime-scene photographs, that "it is the state's burden to prove each element of a crime beyond a reasonable doubt").

In the case at bar, defendant was charged with murder, a necessary element of which is the "unlawful killing of a human being." General Laws 1956 § 11–23–1. Accordingly, the state had the burden of proving beyond a reasonable doubt that Mr. Lima had been fatally stabbed on the night in question and that it was defendant who committed the fatal stabbing. It is our judgment that the trial justice did not abuse his discretion in finding that both Mr. Lima's clothing and Mr. Bessette's testimony were relevant to the prosecution's efforts to establish the elements of the crime at issue. Given the circumstances surrounding Mr. Lima's violent death, this evidence was part of the corpus delicti, and there was no abuse of discretion in the trial justice's decision not to exclude it. *See, e.g., Kaner,* 876 A.2d at 1135; *State v. Bertram,* 591 A.2d 14, 23 (R.I.1991).

The defendant further argues that, even if the clothing worn by Mr. Lima and Mr. Bessette's testimony constituted marginally relevant evidence, that evidence nonetheless should have been excluded pursuant to Rule 403 because, according to defendant, its probative value was substantially outweighed by the danger of unfair prejudice to defendant. We conclude that the trial justice did not abuse his discretion in finding that the probative value of Mr. Lima's clothing and Mr. Bessette's testimony was not substantially outweighed by the danger of unfair prejudice to defendant. We have stated (and have often repeated) that "[u]nless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it." *Wells,* 635 A.2d at 1193; *see also State v. John,* 881 A.2d 920, 928 (R.I.2005); *O'Brien,* 774 A.2d at 107. In the present case, the clothing worn by Mr. Lima and Mr. Bessette's testimony may have had some prejudicial effect, but no more than that which "is always sustained by the introduction of relevant evidence intended to prove guilt." *See State v. Fenner,* 503 A.2d 518, 526 (R.I.1986). This evidence was certainly not *unduly* prejudicial to defendant. Accordingly, we will not disturb the trial justice's decision to admit this evidence.

### III

### The Denial of Defendant's Motion to Exclude Evidence of his Prior Convictions

The defendant's third argument on appeal is that the trial justice erred in denying his motion *in limine,* whereby he sought an order that would bar the prosecution from using his prior convictions as

grounds for impeachment under Rule 609 of the Rhode Island Rules of Evidence if he chose to testify at trial. That motion sought to exclude evidence of all of defendant's prior convictions (which included a 1994 conviction for first-degree sexual assault, a 1992 conviction for possession of cocaine, a 1990 conviction for breaking and entering with intent to commit larceny, and a 1989 conviction for assault), but the motion primarily focused on defendant's 1994 conviction for first-degree sexual assault—the commission of which crime defendant acknowledges also involved the use of a knife. Following a pretrial hearing, the trial justice denied defendant's motion *in limine.*

 Under Rule 609, evidence of a witness's prior convictions may be used for impeachment purposes unless the probative value of the evidence is substantially outweighed by its prejudicial effect.[9] Rule 609 reads, in pertinent part, as follows:

> "(a) *General Rule.* For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record."

> "(b) *Discretion.* Evidence of a conviction under this rule is not admissible if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction."

It is well settled in this jurisdiction that the trial justice has broad discretion in deciding whether or not to admit evidence of prior convictions under Rule 609. *State v. Werner,* 831 A.2d 183, 204 (R.I.2003) ("There is no question that the standard used by this Court in reviewing a trial

justice's ruling to admit or exclude [evidence of a witness's prior convictions] is one of abuse of discretion. In construing Rule 609 * * * the trial justice has broad discretion."); *see also State v. Rocha,* 834 A.2d 1263, 1266 (R.I.2003) ("This Court uses an abuse of discretion standard when reviewing a trial justice's ruling on the admissibility of evidence of previous bad acts, convictions, or character."). We will not disturb a trial justice's ruling in this regard absent an abuse of discretion. *State v. Morel,* 676 A.2d 1347, 1357 (R.I. 1996) ("This Court will not disturb a trial justice's finding regarding the admissibility of prior conviction evidence for impeachment purposes unless our review of the record reveals an abuse of discretion on the part of the trial justice.").

In the present case, we perceive no abuse of discretion in the trial justice's ruling denying defendant's motion *in limine,* which sought to preclude the prosecution from using evidence of his prior convictions for impeachment purposes if he chose to testify. It is our opinion that the trial justice acted well within his broad discretion in not concluding at the *in limine* stage that the prejudicial effect of said evidence would substantially outweigh its probative value. *See* Rule 609. Accordingly, we will not disturb this ruling of the trial justice on appeal.

 Having disposed of that issue on the merits, we now take this occasion to adopt a new policy with respect to appeals that challenge Rule 609 rulings by the trial court. We shall henceforth follow the practice established by the United States Supreme Court for the federal courts in

---

**9.** It should be recalled that Rule 609 of the Rhode Island Rules of Evidence is substantially broader than its federal counterpart. *See State v. Medina,* 747 A.2d 448, 450 (R.I.2000) ("In contrast to Rule 609 of the Federal Rules of Evidence, our Rule 609 provides that the prior conviction need not involve dishonesty, false statement, or a felony to be admissible.").

the case of *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).

In *Luce,* 469 U.S. at 43, 105 S.Ct. 460, the United States Supreme Court unanimously held that, in order "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." In reaching that conclusion the Court reasoned that "[r]equiring that a defendant testify in order to preserve Rule 609(a) claims will enable the reviewing court to determine the impact any erroneous impeachment may have had *in light of the record as a whole * * *.*" *Luce,* 469 U.S. at 42, 105 S.Ct. 460 (emphasis added).[10]

 According to the Supreme Court in *Luce,* if the defendant does not testify during the trial, "[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative." *Id.* at 41, 105 S.Ct. 460. Without the benefit of defendant's actual trial testimony, the appellate court would have no way of knowing whether or not, in the vital context of the trial, the trial judge would have actually allowed the prosecution to attack the witness's credibility using the prior conviction [11] or whether the prosecution would have even sought to impeach the witness with the prior conviction. *Id.* at 41–42, 105 S.Ct. 460. Moreover, a reviewing court would be handicapped in its ability to evaluate the trial justice's weighing of the probative value of the prior conviction against its prejudicial effect (as is required by Rule 609) if it did not know "the precise nature of the defendant's testimony." [12] *Luce,* 469 U.S. at 41, 105 S.Ct. 460. In addition, the Court in *Luce* perceptively stated as follows:

"Even if these difficulties could be surmounted, the reviewing court would still face the question of harmless error. * * * Were *in limine* rulings under Rule 609(a) reviewable on appeal, almost any error would result in the windfall of automatic reversal; the appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying." *Luce,* 469 U.S. at 42, 105 S.Ct. 460.

10. In *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), the United States Supreme Court was construing Rule 609(a) of the Federal Rules of Evidence, which is analogous to (although narrower than) Rule 609 of the Rhode Island Rules of Evidence. The rule construed by the Court in *Luce* provided as follows:

"General Rule.—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment." *Luce,* 469 U.S. at 40 n. 1, 105 S.Ct. 460 (quoting Fed.R.Evid. 609(a)).

11. *In limine* rulings in this area can be subject to change in light of developments during the actual trial. As the Supreme Court observed in *Luce* :

"[An *in limine* ruling permitting impeachment with a prior conviction] is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Luce,* 469 U.S. at 41–42, 105 S.Ct. 460.

12. Moreover, as the Court stated in *Luce,* "[b]ecause an accused's decision whether to testify seldom turns on the resolution of one factor * * * a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." 469 U.S. at 42, 105 S.Ct. 460 (internal quotation marks omitted).

After considerable reflection, we find ourselves in agreement with the reasoning of the United States Supreme Court in *Luce.* Accordingly, we shall act similarly with respect to Rule 609 of our own Rules of Evidence. In order to preserve for appeal a claim of improper impeachment with a prior conviction under Rule 609, the defendant must testify at trial.

We do not disagree with the statement in the defendant's reply brief in the case at bar that "[w]hen a trial justice denies a defendant's motion *in limine* to exclude prior convictions from evidence should he testify, the defendant faces a serious dilemma." However, criminal defendants are not unique in having to face serious dilemmas: the fact is that serious dilemmas are part and parcel of the life of every person. In *Ohler v. United States,* 529 U.S. 753, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000), the United States Supreme Court spoke as follows about the need for a defendant to make a choice in the face of the above-referenced dilemma:

> "[B]oth the Government and the defendant in a criminal trial must make choices as the trial progresses. For example, the defendant must decide whether or not to take the stand in her own behalf. If she has an innocent or mitigating explanation for evidence that might otherwise incriminate, acquittal may be more likely if she takes the stand. * * * But once the defendant testifies, she is subject to cross-examination, including impeachment by prior convictions, and the decision to take the stand may prove damaging instead of helpful." *Id.* at 757, 120 S.Ct. 1851.

We are in full agreement with the Supreme Court that there is nothing "unfair" about requiring a defendant to choose whether or not to testify "in accordance with the normal rules of trial," even though the prosecution's ability to impeach him or her by the use of a prior conviction "may deter a defendant from taking the stand." *Id.* at 759, 120 S.Ct. 1851.

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.