STATE

v.

Raymond McWILLIAMS.

Nos. 2009–379–C.A. and 2010–148–C.A.

Supreme Court of Rhode Island.

July 5, 2012.

Jane M. McSoley, Department of Attorney General, Providence, for State.

Lara E. Ewens, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice FLAHERTY, for the Court.

On May 12, 2009, the defendant, Raymond McWilliams, was found guilty on one count of first-degree robbery and one count of assault with a dangerous weapon in a dwelling. In light of the defendant's impressive criminal history, the trial justice sentenced him to life in prison for first-degree robbery, to be served consecutively to eleven-and-one-half years that previously had been executed because he was a violator of probation on a previously imposed sentence on a prior second-degree murder conviction. The defendant also was sentenced to life in prison for the conviction for assault with a dangerous weapon in a dwelling, to be served concurrently to the sentence imposed for the robbery and consecutively to the previously imposed sentence for murder. Because he qualified as a habitual offender under

G.L.1956 § 12–19–21,[1] the trial justice imposed an additional ten years imprisonment to run consecutively to the previously imposed sentences.

Before this Court, defendant asserts that the trial justice erred by: (1) providing a supplemental jury instruction that contradicted Rhode Island law; (2) refusing to recuse from presiding as the trial justice because of comments he had made during a joint probation-violation hearing and bail hearing; (3) admitting into evidence defendant's prior conviction for second-degree murder; (4) denying his motion for acquittal; and (5) denying his motion for a new trial.

Because we are of the opinion that defendant's arguments are without merit, we affirm the judgment of the Superior Court.

## Facts and Travel

On Friday July 4, 2008, Erica Boutelle was upstairs at her North Kingstown home playing on the floor with her ten-month-old baby when the bedroom door was flung open. At the door stood a man holding a box cutter in his hand with the blade open and pointing out toward Erica and her baby. The intruder entered the room and started to walk toward the terrified Erica and the baby, warning her not to scream, because he "just want[ed] [her] car."

Erica began to cry; she begged the man not to harm her or her child; he simply told her that he "just want[ed] [her] keys." At first the man threatened to tie up Erica and the baby, but she persuaded him not to do so. Erica directed him to where the keys were located, but when he had trouble finding them, she went downstairs, with the baby in her arms, and showed him where the keys were so that he would leave the house. The quick-thinking young mother then followed the man outside and asked him if she could remove the baby's car seat and stroller from the vehicle. The man agreed that she could do so, and after she had retrieved the items, the man drove off.

Erica then returned to the house, locked the door, and called 911. The intruder was determined to be defendant soon thereafter, thanks to Erica's observations and a telephone call from defendant's father, who had read about the incident in the paper and who had indicated to law enforcement that he suspected that his son was involved. After reviewing a photo array displayed by the police, Erica identified defendant as the man who had entered her house on July 4.

On July 6, defendant was arrested, arraigned on a criminal complaint, and presented as a probation violator in accordance with Rule 32(f) of the Superior Court Rules of Criminal Procedure.[2] Soon thereafter, he was charged by indictment with one count of first-degree robbery and one count of assault with a dangerous

1. General Laws 1956 § 12–19–21 provides in pertinent part:

   "(a) If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall been deemed a 'habitual criminal.' Upon

   conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted."

2. The state alleged that defendant had violated the terms and conditions of his probation that he was serving in connection with a 1984 conviction for second-degree murder.

weapon from the incident that took place on July 4.

The defendant's father, Harold McWilliams testified that his son repeatedly had asked him to rent a car for him in the days preceding July 4, 2008. He said that on the morning of July 4, after he again refused to rent a car for his son, defendant became "irate," left the house, and started walking down the road. The defendant's father stated that, after he read an article in the newspaper about the incident that had occurred at Ms. Boutelle's house and the description of the suspect, he decided to "turn [his] son in."

One of defendant's friends, Kevin Dutra, testified that in July 2008 he lived on West Shore Road in Warwick, across the street from the Elks Club. Dutra said that he had known defendant for approximately a year and that he received a call from him on the night of July 6. Dutra testified that defendant arrived at his house driving a Ford Explorer that same night and asked him if he could dispose of some garbage. Dutra said that the next morning the police came to his house and he told them that after defendant left, he watched him drive to the Elks Club across the street.

The Warwick police discovered Ms. Boutelle's vehicle [3] in the early morning hours of July 7. The vehicle was sitting in plain view in the Elks Club parking lot; its keys were found discarded in the vicinity of the vehicle. The Elks Club is approximately fifteen miles from Ms. Boutelle's home. The police also examined the trash bag that defendant had left with Dutra. In it, they found items that had been removed

from the glove box of the Boutelle vehicle, including an insurance card, the registration, and a temporary license receipt belonging to Erica Boutelle.

A justice of the Superior Court presided over a joint probation-violation and bail hearing that was conducted on September 17, 2008. At the hearing, Erica Boutelle testified about the events that occurred on July 4, 2008.[4] A North Kingstown police detective also testified to defendant's admission of certain of the details of his crime. After hearing testimony from both witnesses, the justice, in response to a comment counsel had made, asked defense counsel whether he was waiving his request for bail for his client. Defense counsel replied that he would prefer bail for his client, but that under the circumstances of the case he asked that the court use its discretion. After hearing from counsel, the justice decided to hold defendant without bail. He also found defendant to be a violator of his probation.

About one month before trial, defendant moved to recuse the justice from presiding over the trial. The defendant's motion was predicated on comments that were made by the justice during the joint probation-violation and bail hearing. Defense counsel contended that the "same identical, factual situation" would come before the court again in front of a jury. Counsel argued that, although the case would be decided by a jury, he nonetheless did not believe that the justice could fairly consider a motion for a new trial in the event of a conviction. As a foundation for this assertion, defendant argued that the justice had made certain findings at the joint proba-

---

**3.** Erica testified that the vehicle appeared to be undamaged and that it had more gasoline in the tank than it did when it was taken. She also testified that she conscientiously tracks her vehicle's odometer and that her vehicle had traveled 630–650 miles after it was taken from her home.

**4.** Erica later testified at trial that defendant never returned her vehicle to her home, nor did he call her or indicate in any way that he would drop it off or that she could have it back.

tion-violation and bail hearing, including that the complaining witness was "extremely credible." In response, the justice clarified that his findings after the bail hearing were based on the evidence that had been presented at that time, and that they were not founded on any bias that he bore toward defendant nor any preconceived ideas he had about the case. As a result, the justice denied the motion.

On May 12, 2009, defendant was brought to trial before a jury on charges of first-degree robbery and assault with a dangerous weapon. He testified in his own defense and explained that he brought the box cutter with him because he originally intended to "hotwire" a car.[5] The defendant explained that because it was the holiday weekend, he changed his plans and decided to look for a car parked at an unoccupied residence, where he could break in and take the keys to a vehicle.

The defendant admitted that he did not borrow the car, but insisted he did not steal it either, because he never intended to keep it for himself. However, under cross-examination, defendant admitted that he had had no opportunity to borrow the car of another, and so he planned on "stealing" one.[6] He also testified that he had no intent to return the car to Ms. Boutelle and he conceded that he had wiped the car down in an effort to remove any of his fingerprints so that he might avoid detection.

After the close of evidence the trial justice instructed the jury. With respect to the larceny element of robbery, the trial justice said "the felonious forcible taking of money, goods, or property * * * [t]he term felonious means unlawfully with the specific intention of permanently depriving her of the property taken." The defendant did not object to these original jury instructions. The jury deliberated for a significant time, and then asked the court to provide a clarification or definition of "intent to permanently deprive." After giving the matter significant thought, the trial justice explained that the term "permanently deprived" was not to be taken literally and that it could have any one of three meanings: "either permanently, or for an [un]reasonable length of time, or that the defendant intended to use it in such a way that the owner will probably be deprived of his property."[7] The jury then continued its deliberations, eventually returning verdicts of guilty on both counts. This timely appeal followed.

### Standard of Review

■ "We undergo a review of jury instructions on a *de novo* basis." *State v. Cipriano*, 21 A.3d 408, 423 (R.I.2011) (quoting *State v. Ros*, 973 A.2d 1148, 1166 (R.I.2009)). "[This Court] shall affirm a trial justice's jury instructions when * * * the instructions adequately cover the law and neither reduce nor shift the state's burden of proof." *Id.* (quoting *State v. Linde*, 876 A.2d 1115, 1128 (R.I.2005)).

---

5. The defendant testified that he needed a car for the weekend to bring his girlfriend and her family to Philadelphia.

6. On redirect examination, defendant clarified that when he testified he intended to steal the vehicle, he meant to drive the family to Philadelphia and "leave [the vehicle] so it could be found so it's out in the open."

7. Defense counsel immediately objected at sidebar noting that the court's definition of

"permanently" had been taken from a decision issued by the United States Court of Appeals for the Seventh Circuit in *Guzell v. Hiller*, 223 F.3d 518, 521 (7th Cir.2000). The *Guzell* court derived the definition of "permanent" directly from LaFave and Scott, 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law*, § 8.5 at 357 (1986). *See Guzell* 223 F.3d at 521.

We examine "the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them, * * * and * * * review * * * challenged portions * * * 'in the context in which they were rendered.'" *State v. Cardona*, 969 A.2d 667, 674 (R.I.2009) (quoting *State v. Krushnowski*, 773 A.2d 243, 246 (R.I. 2001)). "The trial justice is bound to ensure that the jury charge * * * correctly states the applicable law. * * * However, [a]n erroneous charge warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party." *State v. Sivo*, 925 A.2d 901, 913 (R.I.2007) (internal quotation marks omitted).

With respect to the motion to recuse, "[a]s we have previously stated, a contention on appeal that a trial justice should have recused himself or herself due to bias or prejudice requires this Court to 'scrutinize closely whatever is asserted to have disclosed prejudice of a character and in such degree as to work a disqualification.'" *State v. Howard*, 23 A.3d 1133, 1135–36 (R.I.2011) (quoting *State v. Nunes*, 99 R.I. 1, 5, 205 A.2d 24, 27 (1964)).

■ With respect to the admission of prior convictions, "[i]t is well settled in this jurisdiction that the trial justice has broad discretion in deciding whether or not to admit evidence of prior convictions under Rule 609 [of the Rhode Island Rules of Evidence]." *State v. Vargas*, 991 A.2d 1056, 1060 (R.I.2010) (quoting *State v. Silvia*, 898 A.2d 707, 718 (R.I.2006)). "Therefore, 'this Court will not overturn such a decision on appeal unless there has been an abuse of that discretion.'" *State v. McRae*, 31 A.3d 785, 789 (R.I.2011) (quoting *State v. Gongoleski*, 14 A.3d 218, 222 (R.I.2011)).

## A. Jury Instructions

■ The defendant first contends that the trial justice erred when he provided a supplemental instruction to the jurors at their request, clarifying the meaning of "intent to permanently deprive." The thrust of defendant's argument is that criminal intent is satisfied only if there is a whole and permanent deprivation of a person's property and that the trial justice "expressly rejected Rhode Island law" when he provided jury instructions that did not specifically utilize the words "wholly and permanently."

The state correctly points out that throughout this state's long jurisprudential history, this Court never has specifically defined the term "permanently" within the context of the crime of robbery but has held that the common-law definition of robbery is applicable, that being the "felonious and forcible taking from the person of another of goods or money [of] any value by violence or [by] putting [the victim] in fear." *State v. Grant*, 840 A.2d 541, 548 (R.I.2004) (quoting *State v. Briggs*, 787 A.2d 479, 487 (R.I.2001)).

The cases cited by defendant fail to support his argument that the trial justice rejected Rhode Island law because, while reiterating the elements of robbery, no case has expressly defined the terms "wholly" or "permanently." *See State v. Rodriquez*, 731 A.2d 726, 729 n. 2 (R.I. 1999) (noting the word "felonious" required the intent "to deprive the victim wholly and permanently"); *State v. Edwards*, 478 A.2d 972, 976 (R.I.1984) (explaining that an essential element of the crime of robbery requires "[t]he specific intention to deprive another wholly and permanently of his property"); *State v. Robalewski*, 418 A.2d 817, 821 (R.I.1980) (stating "an essential element of the crime of robbery is the specific intention to de-

prive another wholly and permanently of his property").

The trial justice's original jury instructions, in perfect accord with our case law, explained to the jury that the term "felonious" meant "unlawfully with the specific intention of permanently depriving [the victim] of the property taken." In response to the jury's question asking for "a clarification or definition of intent to *permanently* deprive," (emphasis in original) the trial justice instructed that:

"Permanently, when it appears in a statute or in judicial decisions of theft or robbery, is not to be taken literally. What permanently means in this context is either permanently or for an [un]reasonable length of time, or that the defendant intended to use it in such a way that the owner will probably be deprived of his property.  * * *  [I]ntent to permanently deprive a victim of his or her property may be inferred where the evidence shows a total indifference or complete lack of concern on the part of the defendant as to whether the victim ever recovers her property. In sum, the [s]tate's burden of proving beyond a reasonable doubt that the defendant at the time of the offense acted with intent to permanently deprive Miss Boutelle of her vehicle may be satisfied by evidence establishing that the defendant either actually intended to permanently deprive her of her vehicle, or that the defendant acted with complete indifference or lack of concern as to whether she got her vehicle back or not." [8]

Because this Court never has explicitly defined "permanent deprivation," a review of decisions issued in other jurisdictions where robbery is also a common-law offense is instructive.

In the seminal larceny case of *State v. Davis*, 38 N.J.L. 176 (N.J.1875), the New Jersey Supreme Court held that the defendant's actions constituted an intent to permanently deprive the owner of his property. There, the defendant unhitched a horse and carriage from its post in front of a residence and "drove rapidly away in a reckless manner." *Id.* at 177. The following morning, both the carriage and horse were found to have been abandoned several miles away and the defendant was convicted of larceny. *Id.*

The court concluded that when the defendant unhitched the horse and carriage from the post, drove them away, and abandoned them with no intent of returning to the owner, he committed larceny. *Davis*, 38 N.J.L. at 178–79. The court focused on the fact that the defendant had made no effort to return the property or to inform the owner about where his property could be found. *Id.* at 178. The court held that the taking was accomplished without an intent to return and that such "[a]n abandonment to mere chance is such reckless exposure to loss that the guilty party should be held criminally responsible for an intent to lose." *Id.* at 178–79.

In *State v. Smith*, 268 N.C. 167, 150 S.E.2d 194, 200 (1966), the court rejected the defendant's argument that he lacked the intent required to commit robbery after he took a rifle belonging to another. There, the proprietor of a service station, armed with a rifle, interrupted a break-in at his service station. *Id.* at 196. The proprietor was in the process of turning the defendant's accomplice over to the police when the defendant suddenly disarmed the proprietor at gunpoint and appropriated his rifle. *Id.* In the course of fleeing the scene, the two criminals were involved in a motor vehicle collision. *Id.* at 197.

---

8.  Specifically, defendant objected to the inclusion of the term "for an [un]reasonable length of time," arguing that those words did not accurately reflect Rhode Island law.

They abandoned both the vehicle they were driving and the rifle at the scene of the accident. *Id.* After he was finally apprehended, the defendant was charged with and convicted of armed robbery after the jury found he possessed the requisite felonious intent when he took the rifle. *Id.*

The *Smith* court explained that the taking of property during a robbery must be done "*animo furandi*, with a felonious intent" to permanently deprive the owner of his property. *Smith*, 150 S.E.2d at 198. The court held that the defendant "clearly intended to appropriate the rifle to a use inconsistent with its owner's property rights." *Id.* Most relevant to the case at bar, the court further explained that the evidence in the case did not permit the inference that the defendant ever intended to return the property to its owner, but that he "was totally indifferent as to whether the owner ever recovered the property" and therefore, "there [was] no justification for indulging the fiction that the taking was for a temporary purpose." *Id.* at 200.

Significantly, in its analysis the *Smith* court focused on the facts and circumstances surrounding the robbery. *Smith*, 150 S.E.2d at 200. The court explained that the defendant, in the course of fleeing from apprehension for the crime of breaking and entering, had no intent or expectation of returning the rifle, because to do so would have invited his detection and capture. *Id.* Finally, the court explained that after the rifle had served its purpose and the defendant had abandoned the rifle at the scene of the accident, he left the owner's recovery of his property "to mere chance and thus constitute[d] 'such reckless exposure to loss' that it [was] consistent only with an intent permanently to deprive * * *." *Id.*

Other courts have similarly interpreted the intent to permanently deprive. *See*

*Commonwealth v. Salerno*, 356 Mass. 642, 255 N.E.2d 318, 321 (1970) ("One who takes property without the authority of the owner and so uses or disposes of it as to show indifference whether the owner recovers possession may be found to intend to deprive the owner of it permanently."); *State v. Hill*, 139 N.C.App. 471, 534 S.E.2d 606, 615 (2000) ("When, in order to serve a temporary purpose of his own, one takes property * * * under circumstances which render it unlikely that the owner will ever recover his property and which disclose the taker's total indifference to his rights, one take's [*sic*] it with intent to steal (animus furandi)."); *State v. Langis*, 251 Or. 130, 444 P.2d 959, 959, 960 (1968) (despite the defendant's protest that he intended to leave a car in "perfect condition," the court held that his intent to permanently deprive could be inferred from the abandonment of the car because it created a "considerable risk that the owner [would] suffer a permanent deprivation of his property"); *McEachern v. Commonwealth*, 52 Va.App. 679, 667 S.E.2d 343, 347 (2008) ("While an intent to permanently deprive must be shown, actual '[p]ermanent loss by the owner is not a required element of larceny' * * * [s]o long as the *animus furandi* formed during the trespassory taking, * * * a later change of mind or desertion of purpose does nothing to expiate the theft.").

In the matter under our consideration, the supplemental jury instruction provided by the trial justice is clearly consistent with those of other common-law jurisdictions that have explicitly interpreted the felonious intent to steal. The defendant has failed to demonstrate to us that the supplemental jury instruction provided by the trial justice did not adequately cover the law. *See Cipriano*, 21 A.3d at 423 (holding a trial justice's jury instructions

shall be affirmed when the instructions adequately cover the law).

We conclude that the supplemental jury instruction provided by the trial justice was completely reasonable and we can discern no error in his instruction.[9]

## B. Trial Justice's Failure to Recuse

■ The defendant's next contention is that the hearing justice should have recused because the comments he made during the joint probation-violation and bail hearing demonstrated a "preconceived opinion" about the evidence in the case. Although he conceded that the jury, and not the trial justice, would be the factfinder at trial, defendant nonetheless contends that ultimately the trial justice would be required to make credibility determinations in the context of a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure if the jury were to find defendant guilty.[10]

■ A judicial officer must recuse only if he is "unable to render a fair or an impartial decision * * *." *State v. Mlyniec,* 15 A.3d 983, 998–99 (R.I.2011) (quoting *Kelly v. Rhode Island Public Transit Authority,* 740 A.2d 1243, 1246 (R.I.1999)). Additionally, "justices have an equally great obligation **not** to disqualify themselves when there is no sound reason to do so." *Id.* (quoting *Ryan v. Roman Catholic Bishop of Providence,* 941 A.2d 174, 185 (R.I.2008)). The party seeking recusal

bears the burden of establishing "that the judicial officer possesses a 'personal bias or prejudice by reason of a preconceived or settled opinion of a character calculated to impair his [or her] impartiality seriously and to sway his [or her] judgment.'" *Mattatall v. State,* 947 A.2d 896, 902 (R.I. 2008) (quoting *Cavanagh v. Cavanagh,* 118 R.I. 608, 621, 375 A.2d 911, 917 (1977)). Significantly, the party seeking recusal must establish this bias or prejudice "in light of all the facts and circumstances appearing in the record * * *." *Cavanagh,* 118 R.I. at 622, 375 A.2d at 917.

In keeping with our established jurisprudence, it is essential for us to review the justice's comments at the joint probation-violation and bail hearing in the context in which they were spoken. At the conclusion of that hearing, defense counsel remarked that although he wished to secure bail for his client, based on defendant's prior conviction record, he could not truthfully argue a position on bail. Then, defense counsel requested that the court use its discretion, remarking "I'd like bail, yeah. If you're going to consider bail, then make it high surety bail, but I realize he's got a history * * *." To this statement, the justice replied:

> "THE COURT: So you're acknowledging what I find is compelling and the conclusion that * * * the proof of his guilt of the new charge, the robbery and the assault with a dangerous weapon with intent to commit robbery is evident?

9. Because defendant's appeal based on the denial of a motion for a new trial and a motion for a judgment of acquittal necessarily turn on whether the Court held that there was error in the supplemental jury instruction, we need not address those contentions because we have concluded that the trial justice did not err.

10. When a trial justice is called upon to decide whether to grant or deny a motion for a

new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, he "sits as the legendary thirteenth juror; and, in light of the charge to the jury, must exercise his or her independent judgment in weighing the evidence and assessing the credibility of the witnesses." *State v. Smith,* 39 A.3d 669, 673 (R.I.2012) (quoting *State v. Clark,* 974 A.2d 558, 569 (R.I.2009)).

"[COUNSEL]: Sure, it is.

"THE COURT: The presumption is great?

"[COUNSEL]: It is.

"THE COURT: If I were sitting on the merits of the case, the evidence is very persuasive that he's guilty of the crime. Mrs. Boutelle is an excellent witness. * * * So I found her testimony very persuasive. I find her very credible. And getting to the other issues that, other factors that I should consider in terms of whether to exercise discretion in favor of admitting Mr. McWilliams to bail, I don't see anything that mitigates this in his favor; and, therefore, I'm going to hold him without bail on that charge."

█ It is essential to bear in mind that the hearing justice was presiding over a joint probation-violation and bail hearing, during which, among other things, he was tasked with deciding "whether the defendant violated one or more terms of his probation by failing to keep the peace or remain on good behavior." *State v. Jones,* 969 A.2d 676, 679 (R.I.2009) (citing *State v. Christodal,* 946 A.2d 811, 816 (R.I.2008)). Significantly, in fulfilling that responsibility, the hearing justice was "charged with *weighing the evidence and assessing the credibility of the witnesses.*" *Id.* (quoting *Christodal,* 946 A.2d at 816 (emphasis added)). Also, at a pretrial bail hearing, it is the function and responsibility of the hearing justice to decide whether the prosecution demonstrated that " 'the proof of guilt is evident or the presumption is great' with respect to such a crime." *Fountaine v. Mullen,* 117 R.I. 262, 264–65, 366 A.2d 1138, 1140 (1976) (quoting R.I. Const. art. 1, sec. 9).

In *State v. Nordstrom,* 122 R.I. 412, 408 A.2d 601 (1979), this Court vacated the judgment of conviction of a defendant as a result of comments made by the trial justice during the course of the trial. After the state had rested its case, but before the defense had presented its case, the trial justice made what he thought was an off-the-record comment to defense counsel. *Id.* at 413, 408 A.2d at 602. During the course of conversation, the trial justice referred to the defendants as "bad bastards." *Id.* On appeal, we held that the defendants had met their burden of proving prejudice because the justice had failed to keep his mind "open until the entire case [had] concluded and arguments of counsel [had] been heard." *Id.* at 414, 408 A.2d at 602. That is not the situation that confronts us in this appeal. The defendant has failed to persuade us that the comments made by the justice after the close of the evidence at the pretrial hearing in this case demonstrated in any way a prejudice or a closed mind on the part of the trial justice. *See id.*

Recently in *Howard,* 23 A.3d at 1137, we held that a hearing justice's comments before a violation hearing had commenced that the defendant "need[ed] to be warehoused" and was "beyond rehabilitation" could lead a detached observer to conclude that the justice possessed a "clear inability to render fair judgment." *Id.* (quoting *Liteky v. United States,* 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Nonetheless, in *Howard* we indicated that "even though harshly and caustically expressed," had the justice made the contested comments in the context of his findings after he had fairly conducted the violation hearing, those comments "would likely not have warranted the hearing justice's recusal." *Id.* Here, the justice made the challenged comments at the close of all the evidence after he fairly conducted a joint probation-violation and bail hearing. *See id.* Moreover, those comments were not personal with regard to the character of defendant and they were made in strict

compliance with the justice's duties in conducting the hearing. We have no hesitation in deciding that no reasonable observer would conclude that the trial justice was unable to render fair treatment in the later trial of this case. *See id.*

It is significant that defendant has failed to bring to our attention even one incident that occurred during trial that could conceivably demonstrate any alleged bias and prejudice harbored toward him by the trial justice, or from which one could "reasonably infer * * * that he was unable to render an impartial decision in [the] case." *Cavanagh,* 118 R.I. at 622, 375 A.2d at 917.

After reviewing all the circumstances of this case, we believe there is no support for defendant's argument that the trial justice should have disqualified himself.

### C. Prior Criminal Conviction

■ Lastly, defendant contends that the trial justice abused his discretion when he ruled that the prosecution would be permitted to introduce evidence of defendant's prior conviction for purposes of impeachment should defendant testify at trial.[11] On appeal, defendant argues that his 1984 record of conviction for second-degree murder should not have been introduced at trial because it was too remote and was overly prejudicial. The defendant also urges that the trial justice's failure to engage in an explicit balancing test, as required by Rule 609 of the Rhode Island Rules of Evidence, demonstrated an abuse of discretion that warrants reversal. In our opinion, neither of these arguments have merit.

"Rule 609 provides that evidence of a prior criminal conviction is inadmissible for impeachment purposes if the trial justice determines that the prejudicial effect of the conviction *substantially* outweighs its probative value." *Vargas,* 991 A.2d at 1060–61. Rule 609 states, in pertinent part, that:

> "(a) *General Rule.* For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness * * *.
>
> "(b) *Discretion.* Evidence of a conviction under this rule is not admissible if the court determines that its prejudicial effect substantially outweighs the probative value of the conviction. If more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, or if the conviction is for a misdemeanor not involving dishonesty or false statement, the proponent of such evidence shall make an offer of proof out of the hearing of the jury so that the adverse party shall have a fair opportunity to contest the use of such evidence."

■ When determining the credibility of a witness, "[a] jury has the right to weigh whether one who repeatedly refuses to comply with society's rules is more likely to ignore the oath requiring veracity on the witness stand than a law abiding citizen." *State v. Mattatall,* 603 A.2d 1098, 1118 (R.I.1992) (quoting *State v. Sands,* 76 N.J. 127, 386 A.2d 378, 387 (1978)). As we noted in *State v. Coleman,* 909 A.2d 929, 941 (R.I.2006),

> "[T]he fact that a prior criminal conviction is more than ten years old only entitles a defendant to a hearing before

---

11. The defendant's prior criminal record included a conviction for domestic simple assault in 2004, a conviction for leaving the scene of an accident with property damage in 2004, a conviction for driving an automobile without the consent of the owner in 2003, three convictions for fraudulent checks in 2003, a conviction for simple assault and battery in 1995, and a conviction for second-degree murder in 1984.

the trial justice at which he may argue the inadmissibility of that conviction; Rhode Island law recognizes no per se disqualification of a prior criminal conviction solely due to temporal remoteness." *Id.* at 941; *see also State v. Morel*, 676 A.2d 1347, 1357 (R.I.1996) ("[T]here is no fixed time limit on the use of prior convictions, but rather, 'the determination of what is remote so as to create undue prejudice in a particular case remains an issue properly left to the discretion of the trial justice.' " (quoting *State v. Simpson*, 606 A.2d 677, 680 (R.I.1992))).

As explained in *Mattatall:*

"when a person has been convicted of a series of crimes through the years, conviction of the earliest crime, though committed many years before, as well as intervening convictions, should be admissible for impeachment purposes unless the trial justice determines that the prejudicial effect outweighs the probative value of the past conviction." *Mattatall*, 603 A.2d at 1117 (citing *Sands*, 386 A.2d at 387).

During trial, defendant took the stand in his own defense.[12] Predictably, the state impeached defendant with his prior convictions, after which defense counsel requested a cautionary instruction which the trial justice immediately provided to the jury. That limiting instruction cautioned:

"Ladies and Gentlemen, let me just tell you one thing at this juncture because of the discussion of Mr. [Mc]Williams's prior convictions. * * * A witness's or a defendant's prior convictions are allowed in evidence, but they are solely for your consideration in evaluat-

ing the witness's or the defendant's credibility. So, I'm instructing you that you may consider that evidence of prior convictions in evaluating credibility, and that they are admitted for no other purpose; that they have no probative force as proof of the crimes charged in the [i]ndictment."

A review of the cautionary instructions satisfies us that the trial justice adequately delineated the limited purpose for which the evidence was admitted, and that he did not abuse his discretion by admitting the prior second-degree murder conviction. Although the trial justice should have better articulated the balancing test between the probative value and prejudicial impact, we are satisfied that the verbiage that he used in the cautionary instruction demonstrated his awareness of the issue of prejudice and that he did, in fact, balance the factors according to a Rule 609 analysis. *See State v. Johnson*, 121 Wis.2d 237, 358 N.W.2d 824, 832 (Ct.App.1984) (noting that in the absence of an express ruling, the giving of a cautionary instruction can reveal that the trial court considered the prejudicial nature of such evidence and sought to ensure it would be properly used by the jury).

Here, the jury had to consider conflicting testimony offered by defendant and the victim. Not surprisingly, that testimony diverged at several critical junctures. For example, Erica testified that while sitting on the floor with her baby in her lap, defendant thrust open the door and approached her within three feet, eventually standing within one step of her. On the contrary, defendant testified that after he slowly opened the door, Erica stood up and

---

**12.** In accordance with this Court's ruling in *State v. Silvia*, 898 A.2d 707 (R.I.2006), defendant properly raised and preserved for review the claim of improper impeachment when he testified at trial. *Id.* at 720 ("In order to preserve for appeal a claim of improper impeachment with a prior conviction under [R.I. R. Evid.] 609, the defendant must testify at trial.").

stepped toward him as soon as he walked into the room. Contradictory testimony was also offered about the box cutter: Erica testified that defendant pointed the box cutter, blade open, toward her and the baby during the encounter; defendant, on the other hand, testified that as soon as he saw the baby he immediately put the weapon away into his pocket.

Because defendant and the victim were the only percipient witnesses to the crime, credibility was a key factor in the jury's analysis as it struggled to determine precisely what occurred on July 4. *See McRae*, 31 A.3d at 793 (observing that the trial justice reasonably concluded that the defendant's prior convictions had significant probative value in a case that may have turned on the credibility of the witnesses). Moreover, defendant has accumulated a significant number of convictions in the past, "thereby making even remote convictions relevant to [his] credibility." *Coleman*, 909 A.2d at 941; *see also Mattatall*, 603 A.2d at 1117.

It is well settled that a reviewing court gives great deference to the decision of a trial justice with regard to the admission of evidence. *See Vargas*, 991 A.2d at 1060; *see also McRae*, 31 A.3d at 789; *Silvia*, 898 A.2d at 718. In light of that deference, we see no abuse of discretion in the trial justice's ruling in this case.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record may be remanded to the Superior Court.

